UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRICIA YEOMANS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>WORLD FINANCIAL GROUP INSURANCE AGENCY, INC., et al.,<br><br>Defendants. | Case No. 19-cv-00792-EMC<br><br>**ORDER DENYING DEFENDANTS' MOTION TO TRANSFER VENUE**<br><br>Docket No. 24 |

## I. INTRODUCTION

Plaintiffs bring a putative class action against Defendants World Financial Group Insurance Agency Inc. (a California corporation), World Financial Group Inc. (a Florida corporation), and Does 1 to 100 (collectively "Defendants"), alleging violations of the California Labor Code, the California Business and Professional Code, and California Wage Orders (and asserting a claim of unjust enrichment) based on Defendants' purported misclassification of Plaintiffs as independent contractors, as opposed to employees. Defendants move the Court to transfer the case to the U.S. District Court for the Northern District of Georgia based on forum selection clauses in the parties' various contracts.

## II. BACKGROUND

A. <u>Factual Background</u>

Plaintiffs allege the following. Defendants represent themselves as a financial- and insurance-products marketing company; they recruit individuals as "Associates" and purport to give people the tools "to build and operate their own financial services business." Class Action Complaint ("Complaint") ¶ 1, Docket No. 1-1. However, Plaintiffs assert that "Defendants

conduct their business by way of a massive pyramid scheme," wherein recruiting new Associates is one of the "main factors involved in achieving promotions." *Id.* ¶ 2. Once someone is an Associate, Defendants pressure that person to "purchase Defendants' financial and insurance products" and to "sell financial and insurance products to the new Associates." *Id.* ¶ 3.

Plaintiffs also allege that "Defendants have unlawfully misclassified Associates as 'independent contractors' rather than as employees" in order to further increase profits. *Id.* ¶ 4. Specifically, each Associate is "required to sign identical, non-negotiable Associate Membership Agreements ('AMAs')," which "set forth uniform rules and policies promulgated by Defendants, which subject Associates to strict control . . . . Plaintiffs and Class Members signed the AMAs." *Id.* ¶ 5. Plaintiffs also contend that "Defendants completely control the overall operation of the business" and "retain the exclusive authority to hire and fire every Associate." *Id.* ¶ 6, 7. Furthermore, because of this classification, Associates earn only commissions, not minimum wage, and they bear the burden of business costs, which Defendants might otherwise bear. *Id.* ¶ 8, 9. In addition, Associates are improperly deprived of the protection of workers' compensation, the benefits of overtime pay, and meal and rest breaks. *Id.* ¶ 9, 10. Plaintiffs contend that, through this conduct, Defendants have violated various provisions of the California Labor Code, the California Business and Professional Code, and California Wage Orders; they also assert a claim of unjust enrichment. *Id.* at 1.

Defendants seek to have this case transferred to the U.S. District Court for the Northern District of Georgia because of forum selection clauses in the parties' various agreements. *See* Defendants' Notice of Motion to Transfer Venue ("Notice") at 1, Docket No. 24. In relevant part, the clause in the Associate Membership Agreement states:

> The parties agree that, without waiver of their rights and obligations under Section V., unless expressly provided to the contrary in this Agreement, the state and federal courts of Georgia shall have exclusive jurisdiction of any litigation between the parties and the Associate expressly submits to the jurisdiction and venue of the federal and state courts sitting in Gwinnett County, Georgia or Cobb County, Georgia with respect to any such litigation.

*Id.* (citing Associate Membership Agreement at 12, Docket No. 24-2). Defendants also allege that many of the Plaintiffs signed Marketing Director Agreements ("MDAs"), which "do not displace

2

the AMAs, but contain a similar forum-selection clause, under which [those] Plaintiffs reaffirmed their commitment to conduct 'all litigation' in Georgia." *Id.* (citing Marketing Director Agreement, Section VI., Docket No. 24-3). The forum selection clause in the Marketing Director Agreement states:

> The parties agree that the state and federal courts of Georgia shall have exclusive jurisdiction of any litigation between the parties and the Marketing Director expressly submits to the jurisdiction and venue of the federal and state courts sitting in Fulton County, Georgia, with respect to such litigation.

Marketing Director Agreement, Section VI., Docket No. 24-3.

B. Procedural Background

Plaintiffs filed this case in San Francisco Superior Court in December 2018. *See* Docket No. 1-1. It was removed by Defendants in February 2019. *See* Notice of Removal, Docket No. 1. In June 2019, Plaintiffs filed a First Amended Class Action Complaint. *See* Docket No. 23. Shortly thereafter, Defendants filed a Motion to Transfer Case; they move the Court for an order transferring the case to the U.S. District Court for the Northern District of Georgia. *See* Docket No. 24.

## III.  DISCUSSION

A. Legal Standard

Defendants have moved the Court under 28 U.S.C. § 1404(a), which provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."

A motion to transfer under § 1404(a) thus calls on the district court to weigh and balance a number of case-specific factors. The presence of a forum-selection clause, such as the parties entered into in this case, will be a significant factor in the district court's calculus. Normally, a court assessing whether to grant a motion to transfer venue may consider factors such as:

> (1) plaintiffs' choice of forum, (2) convenience of the parties, (3) convenience of the witnesses, (4) ease of access to the evidence, (5) familiarity of each forum with the applicable law, (6) feasibility of consolidation with other claims, (7) any local interest in the controversy, and (8) the relative court congestion and time of trial in

3

each forum.

*Vu v. Ortho-Mcneil Pharm., Inc.*, 602 F. Supp. 2d 1151, 1156 (N.D. Cal. 2009) (Illston, J.).

However, the presence of a forum-selection clause changes that analysis. The "proper application of § 1404(a) requires that a forum-selection clause be given controlling weight in all but the most exceptional cases." *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 59–60 (2013) (internal quotation marks omitted). In addition, "[t]he presence of a valid forum-selection clause requires district courts to adjust their usual § 1404(a) analysis in three ways." *Id.* at 63. First, the plaintiff's choice of forum "merits no weight"; instead, "as the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." *Id.* Second, "[w]hen parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." *Id.* Thus, the Court "should not consider arguments about the parties' private interests, and instead "may consider arguments about public-interest factors only." *Id.* However, such factors "will rarely defeat a transfer motion." *Id.* Finally, "when a party bound by a forum-selection clause . . . files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules—a factor that in some circumstances may affect public-interest considerations." *Id.*

B.  <u>Analysis</u>

The parties dispute three issues regarding the forum selection clauses at issue in this case. First, Plaintiffs assert that "Defendants failed to properly authenticate Plaintiffs' AMAs and MDAs," which means that "the authenticity of the documents is disputed." Plaintiffs' Opposition to Defendants' Motion to Transfer Venue ("Opp.") at 4, Docket No. 41. Second, and relatedly, Plaintiffs contend that they "never saw or were provided with a full copy of the AMA" when they were recruited, and instead were only provided with the AMA's signature page. *Id.* Third, the parties disagree as to whether the forum selection clauses in the AMAs and MDAs violate California public policy and are therefore voidable. *See* Motion to Transfer Venue ("Mot.") at 7, Docket No. 24; Opp. at 5. Assuming, for the sake of argument, that the documents are properly

4

authenticated and that Plaintiffs did see all of the documents' provisions in their entirety when signing them, the Court finds—for the reasons discussed below—that the third issue is the one upon which Defendants' Motion turns. The Court focuses its analysis accordingly.

1. Contravention of California Public Policy

Plaintiffs argue that enforcing the Agreements' forum-selection clauses "is against the strong public policy of California in favor of its workers' protections as expressed by Cal. Labor Code § 925." Opp. at 13. In relevant part, Section 925 of the California Labor Code provides: "An employer shall not require an employee who primarily resides and works in California, as a condition of employment, to agree to a provision that would . . . [r]equire the employee to adjudicate outside of California a claim arising in California, [or] [d]eprive the employee of the substantive protection of California law with respect to a controversy arising in California." Cal. Labor Code § 925(a). Any contractual provision "that violates subdivision (a) is voidable by the employee." *Id.* § 925(b). In addition, § 925 applies "to a contract entered into, modified, or extended on or after January 1, 2017." *Id.* § 925(f). Although the Supreme Court has held that public-policy factors "will rarely defeat a transfer motion," *Atl. Marine*, 571 U.S. 64, federal courts in California have concluded that "[i]n Section 925, California expresses a strong public policy to protect employees from litigating labor disputes outside of their home state." *Karl v. Zimmer Biomet Holdings, Inc.*, No. C 18-04176 WHA, 2018 WL 5809428, at *2 (N.D. Cal. Nov. 6, 2018) (Alsup, J.). With that in mind, the Court proceeds to analyze three questions: (1) Does § 925 apply to Plaintiffs, who are currently classified as independent contractors? (2) Does § 925, which effects labor agreements entered into on or after January 1, 2017, govern the Agreements at issue in this case? And (3), Is there a plausible argument that agreeing to the forum selection clause was a condition of employment governed by § 925?

a. "Employee" Under Section 925

The first question is whether "employee" as that term is used in § 925 applies to Plaintiffs (where Defendants have classified them as independent contractors) and thus, whether—until otherwise adjudicated—they are putative employees. Complaint ¶ 4. The "label placed by the parties on their relationship is not dispositive." *Karl*, 2018 WL 5809428, at *3. As Judge Alsup

5

1  has explained, whether § 925 applies to these Plaintiffs "depends on a careful consideration of
2  whether the complaint sets out facts and circumstances (taken as true) from which one could
3  conclude that plaintiff has made a substantial showing that he or she is an employee under
4  California law." *Id.* The determination of classification begs the ultimate question at issue in this
5  case. But that question must be considered at least provisionally in determining venue. Judge
6  Alsup's decision provides a fair and logical test: for § 925 to apply, Plaintiffs must have "pled
7  facts sufficient to show that [their] misclassification claim . . . is plausible." *Id.* The plausibility
8  standard comports with the *Iqbal*/*Twombly* test of Federal Rule of Civil Procedure 8. *See Karl*,
9  2018 WL 5809428, at \*3; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). That approach
10 recognizes the presumption of an employment relationship under California law, the strong policy
11 underlying § 925, as well as the defendant's interest in not having its right to the venue
12 contemplated in its contract undermined by a frivolous or conclusory assertion by Plaintiffs.

Plaintiffs have made a sufficient showing here. "[T]he recent California Supreme Court decision in *Dynamex Operations W. v. Superior Court*, adopting the ABC test, made clear that all workers are presumed to be employees." *Karl*, 2018 WL 5809428, at \*2 (citing *Dynamex Operations W. v. Superior Court*, 4 Cal. 5th 903, 955–56 (2018)). An employer may rebut that presumption by showing that (1) the worker is free from the control and direction of the hiring entity, (2) the worker performs work that is outside the usual course of the hiring entity's business, and (3) the worker customarily engages in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity. *Dynamex*, 4 Cal. 5th at 958–62. In their Complaint, Plaintiffs allege:

- that the AMAs set out rules and policies that "subject Associates to strict control,"
- that Defendants "completely control the overall operation of the business" through their organizational hierarchy and promotion procedures,
- that Defendants "create and administer" the commission and compensation plans,
- that Defendants "create the marketing and presentation materials, which Associates must use and may not alter . . . and establish the exclusive list of

products the Associates can sell; and set prohibitions on selling competing products or joining other similar organizations," and

- that Defendants retain the exclusive authority to hire and fire every Associate.

*See* Complaint at 3–4. Taken together, these allegations are highly suggestive of a relationship in which Plaintiffs work under the control and direction of Defendants.

With respect to the second factor, Plaintiffs allege that they "market financial and insurance products" for Defendants. Opp. at 16–17. Defendants assert that "WFG is a financial services marketing company." Mot. at 1. From these two simple assertions, it is apparent that Plaintiffs perform work that—far from being "outside the usual course of the hiring entity's business"—is central to Defendants' business. Finally, the third *Dynamex* factor is a bit more ambiguous, but ultimately it, too, tips in favor of employment. That factor contemplates that an independent contractor "generally takes the usual steps to establish and promote his or her independent business—for example, through incorporation, licensure, advertisements, routine offerings to provide the services of the independent business to the public or to a number of potential customers." *Dynamex*, 4 Cal. 5th at 962. While WFG Associates obtain insurance and securities licenses and also provide their services to the public, any advertising that they do must use the marketing and presentation materials provided by Defendants (which may not be altered). *See* Complaint at 3–4. The fact that Defendants "establish the exclusive list of products the Associates can sell" and prohibit the sale of anything not on that list also cuts against the idea that Plaintiffs operate "independent business[es]." *Id.* at 4. Defendants do not dispute these contentions, aside from cursorily asserting in a footnote that "Plaintiffs were not 'employees' as Labor Code § 925 requires." Reply at 11 n.4. In light of Plaintiffs' assertions (and the absence of meaningful rebuttal), the Court finds that Plaintiffs have pled sufficient facts to support a plausible claim of misclassification at this stage.[1]

---

[1] The Court notes that the question whether *Dynamex* applies retroactively has not been decided. *See Vazquez v. Jan-Pro Franchising Int'l, Inc.*, No. 17-16096, 2019 WL 4648399, at *1 (9th Cir. Sept. 24, 2019) (certifying the question to the California Supreme Court). But a recent California Court of Appeal decision holds that it is. *See Gonzales v. San Gabriel Transit, Inc.*, No. B282377, 2019 WL 4942213, at *11 (Cal. Ct. App. Oct. 8, 2019). In any event, even under the prior standard (laid out in *S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341

2. <u>Effective Date</u>

Turning to the question of modification, the parties disagree as to whether the contracts and Agreements out of which Plaintiffs' claims arise were modified after January 1, 2017, the effective date of § 925. Defendants contend that:

- All Plaintiffs' AMAs pre-date 2017, Reply at 9;
- MDAs are irrelevant and do not set out conditions of employment, since promotions are voluntary, *id.*;
- The AMAs each state: "This Agreement . . . constitutes the entire agreement and understanding between the parties . . . No change, amendment . . . shall be binding on WFG unless in writing and signed by an officer designated by the President of WFG," and none of the modifications were in writings signed by officers of the President, *id*. at 12.

Plaintiffs argue that several facts bring the contracts within the ambit of § 925. *See* Opp. at 17–18. In particular, Plaintiffs highlight the following:

- Ms. Abtahi executed her MDA on March 12, 2017, Opp. at 18;
- In 2018, Defendants published a document entitled "U.S. Compensation & Advancement Guidelines, Effective January 1, 2011, Updated May 2018" that applied to all Associates. Opp. at 18; *see also* Declaration of Adam Tamburelli ("Tamburelli Decl."), Exh. B, Docket No. 41-3. In his deposition, Andrew Schaad, Defendants' Director of Operations, testified that these documents are "the policies and procedures with regards to compensation and advancement." *See* Deposition of Andrew Schaad ("Schaad Depo.") at 87:10–11, Docket No. 41-2. He further testified that the document contained changes to compensation packages. *Id.* at 46:14–17; *see also id.* at 97:17–18 (noting "an update to the compensation

---

(1989)), the Court notes that there is significant evidence of control by Defendants over Plaintiffs, as well as a number of secondary *Borello* factors that point toward the existence of an employment relationship. Thus, the Court concludes that—even under the prior *Borello* standard—Plaintiffs have pled sufficient facts to allege a plausible misclassification claim.

8

schedule"). He also testified that the document would "effect the commissions to be paid to the associates." *Id.* at 44:1–3; 46:14–17.

- On January 1, 2019, Defendants also sent Plaintiffs a message that announced an "important and significant shift in how the company calculates points as it relates to its recognition system." Opp. at 19; *see also* Declaration of Tricia Yeomans ("Yeomans Decl."), Exh. C, Docket No. 41-6. As the Compensation & Advancement Guidelines document explains, points are "the values used for advancements, contests, bonus pools, leaders bulletin rankings and other recognition that are calculated from the total revenue generated." Tamburelli Decl., Exh. B. Thus, a "significant shift in how the company calculates points" corresponds to a "significant shift" in how advancements, bonuses, and other recognitions are determined.

- On January 1, 2017, Defendants made changes to the Associate Transfer and Senior Marketing Director advancement policies. Some changes affected all Associates, while others outlined new requirements that Senior Market Directors would have to meet to avoid being demoted. Opp. at 19; *see also* Tamburelli Decl., Exh. D, Docket No. 41-5. In his deposition, Mr. Schaad testified that these documents reflected an update to Defendants' policies and procedures pertaining to demotion. Schaad Depo. at 60:11–16.

- In May 2019, Defendants sent out an email notifying Associates that the advancement guidelines were again being changed for all promotion levels. Opp. at 20; *see also* Yeomans Decl., Exh. B, Docket No. 41-6 (noting changes to Defendants' "advancement guidelines for all promotion levels"). The email also announced a new mandatory "platform fee" for Associates. *Id.*

These actions materially changed the rules and compensation for Plaintiffs.

Defendants argue these changes do not constitute modifications to the AMAs or MDAs which would trigger application of § 925. However, the Court finds none of these points persuasive. First, Defendants deny that "any later changes to commission or advancement

9

amended the parties' AMAs." Reply at 13. Mr. Schaad elaborated on this point in his deposition, contending that the Agreements were not modified by changes to Associates' compensation because those Agreements "reference[] compensation [but] do[] not state how it is paid." Schaad Depo. at 20:1–4; *see also id.* at 40:21–22 (same contention); *id.* at 96:13–14 ("Changes to the commission rates do not change the contract."); *id.* at 97:16–18 ("There was no update to the agreement, but there was an update to the compensation schedule."). However, he concedes that "the agreement contemplates the future changes to compensation being put in place by way of updated or changed guidelines of commission schedules." *Id.* at 97:24–98:3. Defendants contend that "courts regularly hold where a contractual term contemplates potential future changes, the occurrence of those changes does not change the terms or conditions of the agreement." Reply at 13. However, the case cited by Defendants, *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 210 (2011), is inapposite. That case held that—specifically within the credit card context—"no change-in-terms notice is required if the creditor specifies in advance the circumstances under which an increase [in rates] . . . will occur." *McCoy*, 562 U.S. at 210. That is to say, if a credit card agreement contemplates the specific terms of a potential rate increase (*e.g.* under what circumstances an increase can occur and what the maximum rate could be), the triggering of that rate increase does not constitute a modification of the contract. Far from announcing the broad rule that Defendants contend, *McCoy* suggests only that where a credit card interest rate is changed to a level specified in the original cardholder agreement, no modification of that agreement is said to have occurred.[2] *See McCoy*, 562 U.S. at 207.

In cases more closely analogous to the one at bar, courts have held that, even where an employment agreement contemplates that provisions "may be amended from time to time," subsequent modifications can still bring an agreement within the purview of § 925 if they occur on or after January 1, 2017. *See, e.g.*, *Friedman v. Glob. Payments Inc.*, No. CV183038FMOFFMX, 2019 WL 1718690, at *3 (C.D. Cal. Feb. 5, 2019) ("defendants ignore that even if the

---

[2] To the contrary, *McCoy* may even suggest that where an interest rate is changed to a level not specifically contemplated in the original contact, a modification *has* occurred. *See, e.g.*, *McCoy*, 562 U.S. at 207 n.6.

10

employment agreements permitted them to unilaterally change the terms of plaintiffs' compensation, such changes nonetheless modified the employment agreements. . . . In short, the court finds that § 925 applies to this action"). Looking back to *McCoy* and the credit card context, it appears that a modification can be said to occur when "the contract allows the creditor to increase the rate at its discretion *but does not include specific terms* for an increase." *McCoy*, 562 U.S. at 213 n.10 (emphasis added). Thus, comparing the opinions in *McCoy* and *Friedman*, it appears that, had Defendants presented Associates with a compensation scale that enumerated specific levels of compensation corresponding to specific conditions, an Associate's transition from one specified pay-level to another might not constitute a contract modification. But that is not what happened here. Instead, the Agreements simply contemplated, in a general way, "future changes" that would take the form of "updated or changed guidelines of commission schedules." Schaad Depo. at 97:24–98:3. That general reservation does not immunize material charges to compensation from triggering the application of § 925. The Court finds that the modifications discussed above do in fact bring the parties' employment agreements within the sweep of § 925.

Second, Defendants contend that no modification occurred because nothing in writing, signed by a WFG officer designated by the President of WFG was presented to Plaintiffs, and that was the only way by which the Agreements could be modified. Reply at 12. However, courts have held that a unilateral modification can bind parties, even where a previous agreement could "not be modified or amended except by an instrument in writing executed by each of the parties." For example, in *Karl*, Judge Alsup wrote: "The unilateral modification — signed by virtue of company letterhead via official business email — bound defendants. Plaintiff signified his acceptance by his continued labor under the modified terms, including a higher compensation. The revision here has been executed by both parties, and therefore constitutes a modification for purposes of applying Section 925." *Karl*, 2018 WL 5809428, at *4. Here, too, the modifications were delivered to Plaintiffs on official company letterhead, and they were accepted by Plaintiffs through Plaintiffs' continued labor on behalf of Defendants. Defendants' citation to *Yates v. Norsk Titanium US, Inc.*, No. SACV1701089AGSKX, 2017 WL 8232188, at *3 (C.D. Cal. Sept. 20, 2017), is unpersuasive. *Yates* held that an "implied-in-fact" modification could not supersede

11

the terms of a contract that required amendments to be in writing; it did not hold that something much closer to a signed writing (such as an official business email sent on company letterhead) could not do so. Thus, as in *Karl*, where changes were presented on company letterhead, the modifications at issue here bring the AMAs and MDAs within the sweep of § 925. *See West v. JPMorgan Chase Bank, N.A.*, 214 Cal. App. 4th 780, 798 (2013) ("Though not signed by anyone at Chase Bank, the April 5, 2010 letter bears the Chase Bank letterhead, which suffices as a signature." (citing Rest. 2d Contracts, § 134 ("Although it is usual to sign at the end of a document, a printed letterhead or billhead may be adopted as a signature."))).

3. Conditions of Employment

Defendants argue that the MDAs are not conditions of employment "because promotion to Marketing Director is a voluntary choice."[3] *Id.* at 9. Defendants cite no authority for the proposition that conditions of employment for a position to which someone was promoted are not "conditions of employment" for the purpose of § 925, and the Court is aware of no such authority. In addition, had Plaintiffs *not* been promoted to the level of Marketing Director, they would have still been bound by the AMA as Associates; that contract contained a similar forum selection clause, and Defendants do not argue that agreeing to that forum selection clause was not a condition of employment. *See, e.g.*, Reply at 11 ("Plaintiffs executed the AMAs before 2017, and for the MDA executed in 2017, it was not a 'condition of employment,' so the argument does not apply.").[4] Thus, the "voluntary choice" that most of the Plaintiffs made in accepting their promotions did not meaningfully change the "conditions of employment" they faced, at least as those conditions pertained to the forum selection clause. As a result, those Plaintiffs' claims have

---

[3] The MDA (which bears the title "Authorization for Contract Change") states: "Unless the provisions of this Agreement expressly provide otherwise, the terms and conditions of your Associate Membership Agreement remain in force." Docket No. 24-3 at 1, 3. Defendants contend that "[t]he MDAs contain a similar forum-selection clause, under which Plaintiffs reaffirmed their commitment to conduct 'all litigation' in Georgia." Notice at 1. Although Defendants may intend to imply something different from displacement through their use of the word "reaffirmation," the Court finds that the MDA displaces the AMA venue clause.

[4] As a result, it appears that Defendants have conceded that the AMA was a condition of employment. This concession means that Robert Jenkins—the only Plaintiff who did not make it to the level of Marketing Director (and thus signed only an AMA and not an MDA)—has been brought within the ambit of § 925.

12

come within the purview of § 925.

Having found that Plaintiffs plausibly allege they are properly classified as employees, that the Agreements imposed "conditions of employment," and that modifications to the Agreements were made after the effective date of § 925, the Court finds that Plaintiffs may void the forum selection clauses at issue.

### 4. Section 1404 Analysis

Where a "forum-selection clause has been found to be unenforceable," the court next "considers the factors of § 1404(a) to decide defendants' motion to transfer," *Friedman*, 2019 WL 1718690, at *3 (quoting *Karl*, 2018 WL 5809428, at *5) (internal brackets omitted).[5] As noted above, a motion to transfer under § 1404(a) thus calls on the district court to weigh and balance a number of case-specific factors. Those factors typically include:

> (1) plaintiffs' choice of forum, (2) convenience of the parties, (3) convenience of the witnesses, (4) ease of access to the evidence, (5) familiarity of each forum with the applicable law, (6) feasibility of consolidation with other claims, (7) any local interest in the controversy, and (8) the relative court congestion and time of trial in each forum.

*Vu*, 602 F. Supp. 2d at 1156. In weighing these factors, the Court must decide if "a transfer would serve 'the convenience of parties and witnesses' and otherwise promote 'the interest of justice.'" *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 62–63, (2013) (quoting § 1404(a)).

Looking first to Plaintiffs' choice of forum, it is clear—from the fact that Plaintiffs filed this case in San Francisco Superior Court—that their preferred forum is California. "[G]reat weight is generally accorded plaintiff's choice of forum," although less weight may be given to the named plaintiff's choice of forum when that person represents a class." *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987). However, the proposed class in this case is limited to people

---

[5] The Court observes that § 925 states that "if a provision is rendered void at the request of the employee, the matter *shall* be adjudicated in California and California law shall govern the dispute." § 925(b) (emphasis added). Such language suggests that § 1404 analysis may not even be necessary once a forum selection clause has been voided, but the Court includes this additional analysis out of an abundance of caution.

13

"who performed work for Defendants in the State California," Complaint at 17, so there is little reason to give less weight to the named Plaintiffs' choice of forum here. As a result, the Court finds that this factor points in favor of keeping the case in California.

The Court also considers the convenience of the parties, the convenience of the witnesses, and ease of access to the evidence. *Vu*, 602 F. Supp. 2d at 1156. Plaintiffs contend that "[v]irtually all witnesses, documents, and counsel for the Plaintiffs are located in California. Many of the witnesses and documents for Defendants are located in California (*i.e.* all co-workers, the entire putative class, and all direct supervisors and management), while some may be located in Georgia." Opp. at 21–22. Similarly, they allege that "because the events giving rise to the claims occurred in California, many of the sources of proof and supporting witnesses are located in California." *Id.* at 22. On the other hand, "Defendants are headquartered in Georgia and their core executive and administrative functions occur in Georgia. Several of Defendants' key witnesses, including Mr. Schaad, are also in Georgia." Defendants' Supplemental Brief Regarding Motion Hearing ("D. Supp.") at 4–5, Docket No. 52. Defendants also contend that some relevant aspects of management's work took place in Georgia and that certain aspects of Plaintiffs' "performance of their agreement occurred in Georgia." *Id.* at 5. While the Court recognizes that—as in nearly any case—there are compelling reasons on both sides, it finds that the convenience of parties and witnesses, as well as ease of access to the evidence (particularly regarding Plaintiffs' employment status as contemplated under both *Dynamex* and *Borello*), weigh in favor of California.[6]

The Court next examines the familiarity of each forum with the applicable law and any local interest in the controversy. *Vu*, 602 F. Supp. 2d at 1156. With respect to familiarity with the applicable law, there is a choice-of-law clause in the parties' Agreements. The AMA states that

---

[6] *Accord Shultz v. Hyatt Vacation Mktg. Corp.*, No. 10-CV-04568-LHK, 2011 WL 768735, at *5 (N.D. Cal. Feb. 28, 2011) ("The Court recognizes that Hyatt's human resources functions, including payroll and commissions computations, are 'centralized' and directed from its Middle District of Florida headquarters, and that these are substantial contacts relating to Plaintiff's claims. However, this does not negate the importance of Plaintiff's Northern District of California contacts. Simply because Hyatt determines policies or makes compensation decisions in Florida does not negate the local impact of those decisions when they are implemented elsewhere.").

14

"provisions of this Agreement . . . will be governed and construed under the laws of Georgia. If conflict or choice of law rules would choose a law of another jurisdiction, each party waives such rules and agrees . . . the substantive law of Georgia shall nonetheless govern." AMA at 5. And the MDA states: "You and WFG agree that this Agreement will be governed by the laws of the State of Georgia." MDA at PDF p. 4. Should either or both of these provisions be enforceable, it is likely the case that a federal court sitting in Georgia would be more familiar with the state laws of Georgia than a federal court in California would be. However, "[d]istrict courts regularly apply the law of states other than the forum state, thus this factor is to be accorded little weight . . . because federal courts are deemed capable of applying the substantive law of other states." *Rabinowitz v. Samsung Elecs. Am., Inc.*, No. 14-CV-00801-JCS, 2014 WL 5422576, at *7 (N.D. Cal. Oct. 10, 2014) (internal citations and quotation marks omitted). Similarly, should California law apply instead, the principle is the same: "[t]his district is more familiar with the state laws underlying the California claims. But . . . other federal courts are fully capable of applying California law." *Friedman*, 2019 WL 1718690, at *3 (quoting *Shultz v. Hyatt Vacation Mktg. Corp.*, No. 10-CV-04568-LHK, 2011 WL 768735, at *4 (N.D. Cal. Feb. 28, 2011)); *see also Karl*, 2018 WL 5809428, at *6 (quoting same text). Thus, this factor merits only minimal weight in the analysis.

With respect to local interest in the controversy, "California's strong public policy shows that the local interest in adjudicating this action is great. Section 925 expresses California's interest in preventing contractual circumvention of its labor law — tipping the scales against transfer." *Friedman*, 2019 WL 1718690, at *4 (quoting *Karl*, 2018 WL 5809428, at *7) (internal ellipses removed). While acknowledging that Georgia also has an interest in the matter because "it is the site of [Defendants'] headquarters and because [Defendants'] personnel and compensation policies are made there," *Shultz*, 2011 WL 768735, at *8, the Court finds that this factor tips in favor of California.

Finally, there is no evidence that it would be more feasible to consolidate claims in either location. And while Defendants assert that "the Northern District of Georgia presents [fewer] 'administrative difficulties flowing from court congestion,' as it had far [fewer] civil cases

15

pending (5,020) as of March 31, 2018 than this Court (8,502)," D. Supp. at 5, these numbers do not reveal anything about the caseload borne by the individual judges in those locations or the capacity of either district to take on additional cases. As a result, the Court finds that this factor is neutral or, at most, tips only slightly in favor of Georgia. Taken together, the Courts finds that that the § 1404(a) factors weigh in favor of keeping the case in California.

Having found the forum selection clauses at issue voidable and having concluded that the factors of § 1404(a) weigh against transfer, the Court **DENIES** Defendant's Motion to Transfer, as other Courts looking at forum selection clauses have done when analyzing § 925 of the California Labor Code. *See, e.g., Smith v. Nerium Int'l, LLC*, No. SACV1801088JVSPLAX, 2019 WL 3110027, at *15 (C.D. Cal. Apr. 3, 2019) (denying transfer because "Section 925's public policy against forcing employees to litigate out-of-state weighs against transfer" even where valid forum selection clause is involved); *see also Karl*, 2018 WL 5809428, at *7 (denying defendants' motion to transfer venue and noting: "California's strong public policy . . . shows that the local interest in adjudicating this action is great. Section 925 expresses California's interest in preventing contractual circumvention of its labor law — tipping the scales against transfer.").

5. Attorneys' Fees

Plaintiffs' counsel seeks attorneys' fees under § 925 of the California Labor Code. *See* Opp. at 22 (citing Cal. Labor Code §925(c) ("a court may award an employee who is enforcing his or her rights under this section reasonable attorney's fees")). Plaintiffs' counsel notes the numerous hours of work dedicated to this motion and Mr. Schaad's "false statements" (among several reasons) as the basis of their request. Opp. at 23. Defendants offer several responses, but the most important among them is that they had "a reasonable basis to bring the Motion." Reply at 14. Because "the Court is loath to award attorneys' fees in the absence of bad faith or unreasonableness," *Gallagher v. Crystal Bay Casino, LLC*, No. 3:08-CV-00055-ECR, 2012 WL 1409244, at *5 (D. Nev. Apr. 20, 2012), Plaintiffs' request for attorneys' fees is **DENIED**.

///

///

///

16

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' Motion to Transfer. In addition, the Court **DENIES** Plaintiffs' request for attorneys' fees.

This order disposes of Docket No. 24.

**IT IS SO ORDERED**.

Dated: November 6, 2019

_____
EDWARD M. CHEN
United States District Judge