**MARLIN & SALTZMAN**
Stanley D. Saltzman, Esq. (SBN 90058)
Karen I. Gold, Esq. (SBN 258360)
Joel M. Gordon, Esq. (SBN 280721)
29800 Agoura Road, Suite 210
Agoura Hills, California 91301
Telephone:   (818) 991-8080
Facsimile:   (818) 991-8081
ssaltzman@marlinsaltzman.com
atamburelli@marlinsaltzman.com
kgold@marlinsaltzman.com

**ROSENBERG, SHPALL & ZEIGEN, APLC**
David Rosenberg (SBN 99105)
Chad F. Edwards (SBN 308909)
Bernardo Heights Corporate Center
10815 Rancho Bernardo Road, Suite 310
San Diego, California 92127
Telephone:   (619) 232-1826
Facsimile:   (619) 232-1859
rsalaw@yahoo.com

**FARNAES & LUCIO, APC**
Malte Farnaes (SBN 222608)
Christina Lucio (SBN 253677)
2235 Encinitas Blvd, Suite 210
Encinitas, California 92024
Telephone:   (760) 942-9430
Facsimile:   (760) 452-4421

*Attorneys for Plaintiffs, individually and on behalf of*
*all others similarly situated and aggrieved*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **TRICIA YEOMANS, ISMAIL CHRAIBI, ADRIAN RODRIGUEZ, ROBERT JENKINS, DOROTHY JENKINS, CAMERON BRADFORD, and FATEMEH ABTAHI**, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>**WORLD FINANCIAL GROUP INSURANCE AGENCY, INC.**, a California corporation; **WORLD FINANCIAL GROUP, INC.**, a Georgia corporation; and **DOES 1 to 100**, inclusive,<br><br>Defendants. | Case No. 3:19-cv-00792-EMC<br>[Assigned to Hon. Edward M. Chen]<br><br>**PLAINTIFFS' MEMORANDUM OF POINT AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION**<br><br>[Filed concurrently with the Declarations of Joel M. Gordon, Adrian Rodriguez, Amy Buchanan, Cameron Bradford, Dorothy Jenkins, Fatemeh Abtahi, Ismail Chraibi, Robert Jenkins, Tricia Yeomans, and Proposed Order]<br><br>Date:   August 27, 2020<br>Time:   1:30 p.m.<br>Location:   450 Golden Gate Ave.<br>San Francisco, California 94102<br>Courtroom 5, 17th Floor |

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ........................................................................1

II.     FACTUAL BACKGROUND ....................................................2

        A.     Plaintiffs Were Not Given Full Copies Of AMA ...............3

        B.     The AMA's Purported Arbitration Agreement....................5

        C.     Schaad's Declaration And Testimony ..................................6

II.     ARGUMENT...............................................................................7

        A.     CALIFORNIA STATE LAW, NOT THE FAA, GOVERNS THE
               CURRENT DISPUTE .................................................................7

        B.     DEFENDANTS CANNOT SHOW THAT A VALID
               AGREEMENT TO ARBITRATE EXISTS ...........................8

               1.     Defendants have not met the burden of proving the
                      existence of an arbitration agreement ....................11

               2.     Evidentiary Objections Pursuant to Local Rule 7-3(a)...........13

        C.     MDA'S "GOVERNING LAW" PROVISION SUPERSEDES
               AMA'S "GOOD FAITH ARBITRATION" PROVISION ...............15

        D.     THE ARBITRATION AGREEMENT IS UNENFORCEABLE
               DUE TO UNCONSCIONABILTY ...........................................15

               1.     Purported agreement to arbitrate is procedurally
                      unconscionable..........................................................16
                      (a)    The AMA is an oppressive contract of adhesion
                             that was not provided to Plaintiffs .........................17

               2.     Purported agreement to arbitrate is substantively
                      unconscionable..........................................................19
                      (a)    "Extraordinary Relief" and "Equitable Relief"
                             provisions in AMA render purported arbitration
                             agreement unconscionable......................................19

                      (b)    The Arbitration Agreement grants the arbitrator
                             the authority to award attorneys' fees and costs to
                             the prevailing party, irrespective of whether the
                             action was brought with merit ................................21

                      (c)    Arbitration agreement's discovery provisions
                             render purported arbitration agreement
                             unconscionable.......................................................22

                      (d)    Unconscionable Provisions Cannot Be Severed
                             From The Arbitration Agreement ...........................23

E.      THE COURT SHOULD ALLOW PLAINTIFF TO CONTINUE
        LITIGATING THE NONARBITRABLE PAGA ACTION ............................24

III.    CONCLUSION.........................................................................................................25

PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION

# TABLE OF AUTHORITIES

## Cases

*Abramson v. Juniper Networks, Inc.*
(2004) 115 Cal.App.4th 638 ...................................................................20

*Ajamian v. CantorCO2e, L.P.*
(2012) 203 Cal. App. 4th 771 ...............................................................21

*Armendariz v. Found. Health Psychcare Servs., Inc.*,
24 Cal.4th 83 (2000) ...............................................16, 19, 23, 24

*Baltzar v. Forever 21, Inc.*
(2016) 62 Cal.4th 1237 ...........................................................................21

*Carbajal v. CWPSC, Inc.*
(2016) 245 CA4th 227 .............................................................................20

*Carlson v. Home Team Pest Def., Inc.*
(2015) 239 Cal. App. 4th 619 ..........................................17, 18, 20

*Carmona v. Lincoln Millennium Car Wash, Inc.*
(2014) 226 Cal.App.4th 74 .....................................................................18

*Chavarria v. Ralphs Grocery Co.*,
733 F.3d 916 (9th Cir. 2013) ................................................................16

*Circuit City Stores, Inc. v. Najd*,
294 F.3d 1104 (9th Cir. 2002) ........................................................9, 19

*Engalla v. Permanente Medical* Group (1997)
15 Cal.4th 951 .........................................................................................11

*Esparza v. Sand & Sea, Inc.*,
2 Cal. App. 5th 781 (Ct. App. 2016)......................................................9

*Fitz v. NCR Corp.*
(2004) 118 Cal.App.4th 702 ..................................................................22

*Gilmer v. Interstate/Johnson Lane Corp.*,
500 U.S. 20 (1991)....................................................................................8

*Gorlach v. Sports Club Co.*
(2012) 209 Cal.App.4th 1497 ..................................................................9

*Hoover v. American Income Life Ins. Co.*
(2012) 206 Cal.App.4th 1193 ..................................................................8

*Huff v. Securitas Sec. Servs. USA, Inc.*,
23 Cal. App. 5th 745 (2018) ..................................................................25

*Independent Ass'n of Mailbox Center Owners, Inc. v. Superior Court*
(2005) 133 Cal. App. 4th 396 ...............................................................24

*Ingle v. Circuit City Stores, Inc.*
(9th Cir. 2003) 328 F3d 1165 ...............................................................18

*Iskanian v. CLS Transportation Los Angeles, LLC*,
   59 Cal. 4th 348 (2014) ...................................................................................24

*Khalatian v. Prime Time Shuttle, Inc.*
   (2015) 237 Cal.App.4th 651 ............................................................................7

*Kilgore v. KeyBank, Nat. Ass'n*,
   673 F.3d 947 (9th Cir. 2012) .........................................................................16

*Kim v. Reins Int'l Cal., Inc.*,
   9 Cal. 5th 73 (2020) .......................................................................................25

*Knepper v. Ogletree, Deakins, Nash, Smoak & Stewart, P.C.*
   (N.D. Cal. 2019) No. 18-cv-00303-WHO .....................................................11

*Knutson v. Sirius XM Radio Inc.*
   (9th Cir. 2014), 771 F.3d 559 ........................................................................11

*Kolani v. Gluska*
   (1998) 64 Cal.App.4th 402 .............................................................................24

*Lane v. Francis Capital Management LLC*
   (2014) 224 Cal.App.4th 676 ............................................................................7

*Little v. Auto Stiegler, Inc.*
   (2003) 29 CA.4th 1064 .............................................................................19, 22

*Martinez v. Master Protection Corp.*
   (2004) 118 CA4th 107 ..............................................................................18, 20

*Mercuro v. Superior Court*
   (2002) 96 Cal.App.4th 167 .............................................................................20

*Mitri v. Arnel Mgmt. Co.*,
   157 Cal. App. 4th 1164 (2007) .........................................................................9

*Molecular Analytical Systems v. Ciphergen Biosystems, Inc.*,
   186 Cal.App.4th 696 (2010) .............................................................................9

*Neal v. State Farm Ins. Cos.*
   (1961) 188 Cal.App.2d 690 ............................................................................17

*Nguyen v. Barnes & Noble Inc.*,
   763 F.3d 1171 (9th Cir. 2014) .......................................................................10

*Nyulassy v. Lockheed Martin Corp.*
   (2004) 120 CA4th 1267 ............................................................................18, 19

*O'Hanlon v. JPMorgan Chase Bank, N.A.*,
   2015 WL 5884844 (C.D. Cal. 2015). ............................................................22

*Ontiveros v. DHL Exp. (USA) Inc.*
   (2008) 164 Cal.App.4th 494 ...........................................................................23

*Perry v. Thomas*,
   482 U.S. 483 (1987) .........................................................................................8

PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION

*Pinela v. Neiman Marcus Group, Inc.*
   (2015) 238 CA4th 227 ...................................................................................... 19

*Rosenthal v. Great Western Fin. Securities Corp.,*
   14 Cal.4th 393 ................................................................................................ 11

*Samaniego v. Empire Today, LLC*
   (2012) 205 Cal.App.4th 1138 .................................................................... 18, 20

*Sanchez v. Western Pizza Enterprises, Inc.*
   172 CA4th 173 ................................................................................................ 18

*Serafin v. Balco Properties Ltd., LLC*
   (2015) 235 Cal.App.4th 165 ...................................................................... 16, 20

*Shepard v. Edward Mackay Enterprises, Inc.*
   (2007) 148 Cal.App.4th 1092 ........................................................................ 7, 8

*Sprecht v. Netscape Communications Corp.,*
   306 F.3d 17 (2d Cir. 2002) ............................................................................. 10

*Szetela v. Discover Bank*
   (2002) 97 CA4th 1094 ................................................................................... 18

*Tiri v. Lucky Chances, Inc*
    (2014) 226 Cal.App.4th 231 .......................................................................... 16

*Trivedi v. Curexo Technology Corp.*
   (2010) 189 Cal.App.4th 387 ............................................................... 18, 20, 21

*United States v. Lopez*
   (1995) 514 U.S. 549 ......................................................................................... 7

*Villacreses v. Molinari* (2005)
   132 Cal.App.4th 1223 ..................................................................................... 11

*Windsor Mills, Inc. v. Collins & Aikman Corp.,*
   25 Cal.App. 3d 987 (1972) ............................................................................. 10

*Woolls v. Superior Court*
   (2005) 127 Cal.App.4th 197 ............................................................................. 7

*Zullo v. Superior Court*
   (2011) 197 Cal.App.4th 477 ...................................................................... 17, 18


**<u>Statutes</u>**

9 U.S.C. § 2 ....................................................................................... 7, 9, 16

CCP section 1281.2 ...................................................................... 9, 24, 25

Civil Code section 1670.5 ............................................................... 23, 24

Code Civ. Proc., § 1283.05 .................................................................. 22

PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION

## I.    INTRODUCTION

Defendants World Financial Group, Inc. and World Financial Group Insurance Agency, Inc. (collectively, "Defendants") argue in their motion to compel arbitration that the seven individual plaintiffs that Plaintiffs Tricia Yeomans, Ismail Chraibi, Adrian Rodriguez, Robert Jenkins, Dorothy Jenkins, Cameron Bradford, and Fatemeh Abtahi, ("Plaintiffs"), agreed to arbitrate the underlying issues in this case when they signed the Associate Membership Agreement ("AMA"). This argument fails for several reasons:

First and foremost, the Plaintiffs never signed the purported AMA.  Defendants never provided Plaintiffs with more than the signature page to the AMA, withholding the pages of the AMA that included the arbitration agreement. Company policy, to this day, dictates that new downline associates are not provided with the full AMA to sign.[1]  Additionally, it was the custom and practice of Defendants to have administrative assistants or upline associates enter the information for new Associates into the WFG system. Declaration of Amy Jo Buchanan ("Buchanan Decl."), ¶ 11.  Assistants were also instructed to docusign on behalf of new recruits. *Id.* Defendants cannot enforce an arbitration agreement that they cannot prove was ever provided or made available to Plaintiffs when the latter signed the AMA signature page and the other documents included in the "sign-up packet" (the "packet").

Second, even if the full AMA had been presented and signed by the Plaintiffs, which is firmly denied by all the Plaintiffs, the arbitration agreement contained therein would be unenforceable due to unconscionability.  Plaintiffs were not provided and did not view the arbitration agreement prior to signing the AMA, or even know of the arbitration agreement's existence until they viewed the whole contract at the time of filing this case, or shortly thereafter. As a contract of adhesion, which Plaintiffs were given to sign on a non-negotiable "take it or leave it" basis.  Furthermore, the arbitration agreement features one-sided provisions that leave *Defendants and Defendants only* with the option of seeking injunctive relief in the courts, along

---

[1] In the Declaration of Andrew Schaad ("Schaad Decl."), Defendants seem to admit that this 7-8 page packet of AMA signature page and other documents, not the full AMA, is the "application" that Associates are given when they sign up. Schaad Decl., ¶ 15, Ex. 9.

with provisions that improperly limit discovery and assign attorneys' fees—all of which are substantively unconscionable.  The unconscionable provisions of the arbitration agreement so permeate the rest of the agreement that they cannot be severed.

Accordingly, Defendants motion to compel arbitration must be denied.

## II.    FACTUAL BACKGROUND

Defendants' stated business purpose is to market financial and insurance products sold through its affiliated companies. Schaad Decl., ¶ 3.  In order to do this, Defendants recruit as many people as possible to work for them as "Associates," enticed by the promise that Defendants will help them build and operate their own financial services business. First Amended Complaint ("FAC"), Dkt. No. 23, ¶ 1.  Plaintiffs contend that in reality Defendants conduct their business by way of a massive pyramid scheme whereby each Associate is required to pay to become an Associate, and then is required to recruit as many friends and family members as possible and sell them insurance and other financial products, and so on down the pyramid.  *Id*. at ¶¶ 2-3

All newly recruited Associates are presented with a packet of documents, including the signature page to the AMA, which forms the basis of the relationship between the Associate and Defendants.  FAC, ¶ 5; *see also* Declaration of Tricia Yeomans ("Yeomans Decl."), Declaration of Ismail Chraibi ("Chraibi Decl."), Declaration of Robert Jenkins ("R. Jenkins Decl."),  Declaration of Dorothy Jenkins ("D. Jenkins Decl."), Declaration of Cameron Bradford ("Bradford Decl."), Declaration of Fatemeh Abtahi ("Abtahi Decl."), and Declaration of Adrian Rodriguez ("Rodriguez Decl.") (collectively, "Plaintiffs' Decl."), all at ¶ 2. The full AMA sets forth uniform rules and policies promulgated by Defendants, which subjects Associates to strict controls and which Plaintiffs contend incorrectly classifies them as independent contractors. *See* Schaad Decl., Dkt. 73-5, Ex. 1. The "completed" AMAs attached to Schaad's declaration are not the documents presented to Plaintiffs when they signed up as WFG associates. Instead, Plaintiffs were presented with the AMA signature page attached as Exhibit A to each of the Plaintiffs' declarations. Plaintiffs did not see or sign the AMAs attached to Schaad's declaration. Yeomans Decl. at ¶ 12. Chraibi Decl. at ¶ 10, R. Jenkins Decl. at ¶ 4, D. Jenkins Decl. at ¶ 4, Bradford Decl. at ¶ 3, Abtahi Decl. at ¶ 8, Rodriguez Decl. at ¶ 4.

Following Plaintiffs' completion of the sign-up packet, it was the custom and practice of WFG upline associates to give the hard-copy packets to an administrative assistant, who would enter the information into the WFG online system.[2] Yeomans Decl. at ¶ 15; Abtahi Decl at ¶ 10; Chraibi Decl. at ¶ 14. Amy Buchanan, manager Chester Palid's executive assistant, admits to entering information and docusigning on behalf of new recruits. Buchanan Decl. at ¶¶ 7-12. Plaintiffs confirm this practice. R. Jenkins Decl. at ¶ 13.

## A.    **Plaintiffs Were Not Given Full Copies Of AMA**

Of critical importance here, and as discussed in detail below, *none of the named Plaintiffs against whom this motion is directed ever saw or received the entire AMA when becoming Associates*. Yeomans Decl. at ¶ 4, Chraibi Decl. at ¶ 4, R. Jenkins Decl. at ¶ 5, D. Jenkins Decl. at ¶ 5, Bradford Decl. at ¶ 3, Abtahi Decl. at ¶ 4, Rodriguez Decl. at ¶ 3. The motion selectively quotes prior declarations from Plaintiffs mentioning that they all provided a signature. Dkt No. 73-4, pp. 1-2. However, Defendants inexplicably fail to recognize what Plaintiffs have claimed all along: that their signatures were affixed to the AMA signature page after being presented with only that one sheet of the actual AMA, the signature page. Plaintiffs' Declarations at ¶ 2. Plaintiffs were all presented packets that included only some or all of the following documents: World Financial Group, Inc., Applicant Profile; References; Background Information; Acknowledgements; Applicant Acknowledgement; W-9; Signature Page of the AMA; and Credit Card Agreement. *Id*.

When initially signing the AMA, Plaintiffs were not represented by counsel. Yeomans Decl. at ¶ 7, Chraibi Decl. at ¶ 7, R. Jenkins Decl. at ¶ 6, D. Jenkins Decl. at ¶ 6, Bradford Decl. at ¶ 4, Abtahi Decl. at ¶ 7, Rodriguez Decl. at ¶ 5.  They were presented with the packet on a "take it or leave it" basis, and it was Plaintiffs' understanding that no changes could be made to the AMAs.  *Id.*  When Ms. Yeomans was presented with the AMA signature page, she was told it was a release so that WFG could use her photograph, which is the same thing that she subsequently told downline associates when she signed them up.  Yeomans Decl. at ¶ 7.

---

[2] The unsigned packet attached to all of Plaintiffs' declarations in support of the motion to transfer opposition, which Defendants claim are "inaccurate," was submitted as an exemplar of what was presented to Plaintiffs when they signed up to be Associates. Opp., Dkt. No. 73, pp. 2-3.

Defendants' motion not only misrepresents the fact that none of the Plaintiffs were given more of the AMA than just the signature page; it also contains a flagrant misrepresentation regarding Ms. Abtahi. *See* Schaad Decl. at ¶ 9. Despite the claims made in Defendants' motion, Ms. Abtahi never docusigned the AMA. Abtahi Decl. at ¶ 8. She contends that the AMA was docusigned without her consent by someone else. *Id.* at ¶__. Even a cursory glance at the evidence provided by Defendants shows that their claim as to Ms. Abtahi is false: the purported signature on the AMA actually reverses Ms. Abtahi's first and last names, and the initialed portions of the document again reverse her first and last name initials, which is not a mistake that Ms. Abtahi would have made *while signing her own name*. *See* Schaad Decl., Dkt. 73-6, Exhibit 2. Furthermore, the signature does not match her own signature, and the handwriting on p. 5 of the AMA (Ms. Abtahi's purported signature) matches the handwriting of Chad Greer, who signed his own name on p. 3. Abtahi Decl. at ¶ 11.

Aside from erroneously entering Ms. Abtahi's name, personnel at WFG, when entering information for Ms. Yeomans, falsely put down that she was self-employed and that she had a Master's degree in "communications" rather than "communication." Yeomans Decl. at ¶ 11. Personnel from WFG also erroneously claimed that Mr. Bradford was self-employed at the time that he filled out his AMA. Bradford Decl. at ¶ 9.

As the Plaintiffs themselves went on to recruit new Associates once they became Associates themselves, they too provided the recruits with only the signature page of the AMA rather than the entire agreement when onboarding with Defendants, as they were trained and instructed to do. Yeomans Decl. at ¶ 15, Chraibi Decl. at ¶ 12, R. Jenkins Decl. at ¶ 11, D. Jenkins Decl. at ¶ 8, Bradford Decl. at ¶ 5, Abtahi Decl. at ¶ 13, Rodriguez Decl. at ¶ 5. Buchanan, an executive assistant to Chester Palid, trained hundreds of Associates, including Plaintiffs, to present new recruits with the packet rather than the full AMA. Buchanan Decl. at ¶ 9. Mr. Palid knew that recruits' names were being docusigned to the AMA without their knowledge or consent. *Id.* When Buchanan docusigned on behalf of new associates, she never reviewed the document or provided a copy to the new associate. *Id.* at ¶ 12.

### B.   <u>The AMA's Purported Arbitration Agreement</u>

The AMA contains a purported agreement, for "Good Faith Arbitration." Schaad Decl., Dkt. 73-5, Ex. 1, at pp. 15-16. This provision requires all employee grievances to be "resolved exclusively by Good Faith Arbitration." *Id.* The Good Faith Arbitration provision states that any arbitration between the parties will be brought in accordance with "rules" that WFG defines as "The Commercial Arbitration Rules of the American Arbitration Association, as in effect at the time of the occurrence of any Grievance." *Id.*

Despite the seemingly broad language of inclusion of the "Good Faith Arbitration" clause, it turns out to be less than inclusive, in an employer friendly manner. On of its provisions, "VI. Extraordinary Relief," states the following:

> "The Associate agrees that WFG shall be entitled to seek Extraordinary Relief to temporarily enjoin violations by the Associate of this Agreement and that WFG may seek Extraordinary Relief in the federal and state courts of the State of Georgia, in any court of competent jurisdiction outside the State of Georgia, as well as in Good Faith Arbitration and if justice requires, in more than one of them, all without having to first comply with the requirements of Article V. The specifics of this Article VI shall not be deemed to preclude or narrow the judicial or arbitral powers regarding Extraordinary Relief."

*Id.* at § VI.

In addition to the "Extraordinary Relief" provision, yet another employer friendly clause, entitled "Equitable Relief", under section D, "Covenants," provides as follows:

> The Associate acknowledges and agrees that, in the event that he/she were to violate or threaten to violate any of the Covenants, WFG's recovery of damages would be inadequate to protect WFG. Accordingly, **the Associate agrees that, in the event of a violation, actual or threatened, of any such Covenants, WFG shall be entitled to injunctive relief and specific performance, notwithstanding any other provision of this Agreement to the contrary.** The Associate acknowledges and agrees that injunctive relief and specific performance are appropriate and necessary in the event of a violation, actual or threatened, of such covenants because there may be no adequate remedy at law for violation of any of such Covenants in that, among other reasons, the property rights of WFG which are protected by such covenants are unique assets which cannot be readily replaced in any reasonable period of time or in any other way adequately protected.

*Id.* at § D.7. [emphasis added]

These clauses apply to the new Associates, who are given the title of "Training Associate," and to those additional positions to which they can subsequently be promoted to, including "Associate" and "Senior Associate." Eventually, if they continue moving up, they can become a "Marketing Director," and then "Senior Marketing Director," depending in large part on the number of new Associates that person recruits. FAC, ¶¶ 2-3. Over time, each Associate has the

opportunity to advance through the levels of the company. Once Associates advance to the level

of Marketing Director, they are required to sign a Marketing Director Agreement ("MDA"). *Id.*

The MDA does not contain an arbitration agreement. Instead, the MDA provides:

> You and WFG agree that this Agreement will be governed by the laws of the State of
> Georgia. If Georgia conflict or choice of law rules would choose a law of another state,
> each party waives such rules and agrees that the substantive law of the State of Georgia
> shall have exclusive jurisdiction of any litigation between the parties and the Marketing
> Director expressly submits to the jurisdiction and venue of the federal and state courts
> sitting in Fulton County, Georgia, with respect to such litigation. *Id.* at p. 3.

The MDA also states, "Unless the provisions of this Agreement expressly provide otherwise, the

terms and conditions of your Associate Membership agreement remain in force." *Id.* at p. 2.

### C.   Schaad's Declaration And Testimony

On August 15, 2019, Plaintiffs took Schaad's deposition, at which time Schaad testified

that he did not personally obtain the AMAs which had been attached to Defendants' Motion to

Transfer and which were again attached to his declaration to this present Motion:

> Q. What did you do before signing this declaration to obtain or review any of the records
> relating to the Plaintiffs listed here?
> **A.  Our legal department procured the documents. I reviewed the declaration and
> agreed with it and signed it.**
> Q.  So you did not personally then undertake any review or research within your corporate
> systems to find any of the records that are talked about in your declaration; is that correct?
> **A.  Correct.**
> Q.  So they were provided to you by the internal legal department?
> **A.  Correct.**
> Q.  Okay. After you got them, did you take any steps to review the records in your systems
> to see if there were any further documents that might be necessary for your review?
> **A.  I did not.**
> Q.  Is it correct that someone else drafted this declaration for your review?
> **A.  Correct.**

*See* Deposition Transcript of Andrew Schaad ("Schaad Depo."), Ex. A to the Declaration of Joel

M Gordon ("Gordon Decl."), at 29:5-29:21.

Schaad added that he did no other independent investigation or research to determine

whether higher-level employees electronically signed documents on behalf of new hires, and that

he otherwise did not seek any information regarding the circumstances of the execution of the

AMAs or MDAs, as follows:

> Q.  Okay. Do you know who completed the DocuSign -- who went through the process
> online of doing it for each of these Plaintiffs?
> [objection]

**THE WITNESS: No.**

...

Q. Prior to signing the declaration, did you speak with any of the seven Plaintiffs' supervisors or managers about the documents or the declaration that you were about to sign.

**A. No.**

Q. Did you seek any information as to any of the seven Plaintiffs from anyone other than what you were given by in-house counsel or outside counsel?

**A. No.**

*Id*. at 33:7-11, 35:16-24. Although he testified that "[t]he process is DocuSign," Schaad admitted that "I do not know DocuSign that well," before admitting that the typewritten signatures on the AMAs did not look like DocuSign signatures. *Id*. at 68:9-69:2.

## II.    ARGUMENT

### A.    CALIFORNIA STATE LAW, NOT THE FAA, GOVERNS THE CURRENT DISPUTE

As a preliminary matter, California law, not the FAA, governs this dispute.  The FAA only applies to a "contract evidencing a transaction involving commerce" that contains an arbitration provision.  9 U.S.C. § 2; *Khalatian v. Prime Time Shuttle, Inc.* (2015) 237 Cal.App.4th 651, 657.  Furthermore, a "relatively trivial impact on interstate commerce cannot be used as an excuse for broad regulation of state or private activities."  *Shepard v. Edward Mackay Enterprises, Inc*. (2007) 148 Cal.App.4th 1092, 1099.

Applying these principles, the United States Supreme Court has identified three categories of activity that Congress may regulate under the commerce power, including "those activities having a substantial relation to interstate commerce."  *Shepard*, 148 Cal.App.4th at p. 1098 (citing *United States v. Lopez* (1995) 514 U.S. 549, 558–559).  The party asserting FAA preemption bears the burden to present evidence establishing that a contract with the arbitration provision affects one of these three categories of activity, and failure to do so renders the FAA inapplicable.  *See Lane v. Francis Capital Management LLC* (2014) 224 Cal.App.4th 676, 687; *Woolls v. Superior Court* (2005) 127 Cal.App.4th 197, 211; cf. *Shepard*, *supra*, 148 Cal.App.4th at p. 1101.

Defendants have not met their burden of showing that the activities at issue in the Complaint have a "substantial relation to interstate commerce."  They cite two Supreme Court cases as having "the type of agreements at issue here," but, aside from this conclusory language, do not point to any particular facts that specify the similarity between the agreements in those cases

and the AMA.  *See* Motion to Compel Arbitration, p. 6.  In fact, both *Perry v. Thomas*, 482 U.S. 483, 513 (1987) and *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991) involved employees who signed agreements to arbitrate in order to register with the New York Stock Exchange; in neither case was the employment contract the one in dispute, as it is in Plaintiffs' case.  *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 at n.2. A more apt comparison is to *Hoover v. American Income Life Ins. Co.* (2012) 206 Cal.App.4th 1193, 1207-8, in which the defendant, a Texas-based insurance company, failed to show that an employment agreement with its California-based employee involved interstate commerce ("[Plaintiff] did not work in other states or engage in multimillion dollar loan activity that affected interstate commerce by negotiating with a bank that was headquartered in another state.")

Defendants note that Defendants are based in Georgia and that Plaintiffs are residents of California.  However, the facts outlined in Plaintiff's declarations show that they were not engaged in any activities having a *substantial* relationship to interstate commerce.  Plaintiffs worked out of California offices, selling financial products to California residents and recruiting other California residents as "downline" Associates.  There is no element of interstate commerce in the business practices at issue in this case.  *Id.*  Far from meeting their burden, Defendants have pointed to nothing more than a "relatively trivial impact on interstate commerce."  *Shepard v. Edward Mackay Enterprises, Inc.*, 148 Cal.App.4th at 1099.  Therefore, California law applies.

## B.   DEFENDANTS CANNOT SHOW THAT A VALID AGREEMENT TO ARBITRATE EXISTS

Defendants' motion is riddled with false claims regarding how Plaintiffs, the only persons to whom the motion is directed, were presented with the AMA prior to signing the document.  The motion presupposes that Plaintiffs actually saw the arbitration clause that Defendants are now trying to enforce. However, Plaintiffs demonstrate, in the attached declarations, consistent with the facts alleged in the FAC, that they were not provided anything further than the AMA signature page when signing up.  It was also a common practice for upline associates to complete the docusigns for their downline associates, as Ms. Buchanan's declaration makes clear. Defendants bear the burden of showing the existence and validity of the arbitration agreement, which they have failed entirely to do.  And they cannot do so on the facts before this Court.

8

It is also worthy of note that not a single manager of the Defendants' offices in California has stepped forward to contest the Plaintiffs' individual assertions (long made in this case) with regard to how they were signed up. Additionally, while the Defendants' records undoubtedly reflect which upline associates recruited and signed up these seven plaintiffs, not a single declaration from any such person has been offered by the moving parties. The only declarations they do offer are from unknown, unrelated and irrelevant Associates, which will be addressed hereafter. As Ms. Buchanan's declaration makes clear, WFG managers, such as Chester Palid, were authorizing Associates to sign up new recruits with only the packet, entering new recruits' information into the electronic system, and docusigning on the new recruits' behalf, without getting the consent of the recruits or showing them the full AMA.

Under both the California Arbitration Act and the Federal Arbitration Act, the enforceability of an arbitration agreement is dependent on the actual consent of the parties thereto, not some unrelated persons who may have been employed by the same Defendants. CCP section 1281.2; *Gorlach v. Sports Club Co.* (2012) 209 Cal.App.4th 1497, 1505 (noting that "when presented with a petition to compel arbitration, the trial court's first task to determine whether the parties have in fact agreed to arbitrate the dispute."); *Circuit City Stores, Inc. v. Najd,* 294 F.3d 1104, 1108 (9th Cir. 2002) ("Section 2 of the FAA provides that arbitration agreements 'shall be valid, irrevocable, and enforceable, save upon such grounds that exist at law or in equity for the revocation of any contract.' 9 U.S.C. § 2. Hence, generally applicable contract defenses, such as lack of consideration and mutual assent, may invalidate an arbitration agreement.) California contract law applies to determine whether the parties have formed a valid agreement to arbitrate. *Mitri v. Arnel Mgmt. Co.*, 157 Cal. App. 4th 1164, 1170 (2007).

In order for a contract to be binding, there must be mutual assent. "To establish a valid agreement to arbitrate disputes, the petitioner bears the burden of proving the existence of a valid arbitration agreement by a preponderance of the evidence, and a party opposing the petition bears the burden of proving by a preponderance of the evidence any fact necessary to its defense." *Esparza v. Sand & Sea, Inc.*, 2 Cal. App. 5th 781, 787 (Ct. App. 2016); citing *Molecular Analytical Systems v. Ciphergen Biosystems, Inc.*, 186 Cal.App.4th 696, 704 (2010).

The cases that Defendants cite for the contention that "Plaintiffs consented through their conduct" are all distinguishable from the present case because Plaintiffs herein, unlike the parties challenging arbitration motions in Defendants' cited cases, were never given the full contract for review before signing.  Motion to Compel, Dkt No. 73, p. 4.  Even with this distinction in mind, at least one of the cited cases supports Plaintiffs' current position.  In *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal.App. 3d 987 (1972), the dispute was over whether the purported arbitration provision was conspicuous to the party challenging the provision.  In that case, the court ruled against compelling arbitration, in part, because the plaintiff "did not have actual knowledge of the provision until after it had received defendant's demand for arbitration." *Id.* at 994.  The court concluded that there was "no agreement by plaintiff to arbitrate." *Id.*

Other cases cited by Defendants serve only to reinforce Plaintiffs' argument that there was no mutual assent to the purported arbitration agreement and therefore that agreement is not enforceable.  In the *Nguyen* case, a Defendant sought to enforce an arbitration provision contained in a "browsewrap" agreement, with the court stating that these provisions are enforceable only where a reasonably prudent user would have been on inquiry notice that a "terms of use" agreement existed.  *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014).  The court in *Nguyen* went on to explain that these provisions are not enforceable in cases where, for example, the terms of use "would not have become visible to plaintiffs only if they had scrolled down to the next screen."  *Id.*, citing *Specht v. Netscape Communications Corp.*, 306 F.3d 17, 23 (2d Cir. 2002).  "In short," the *Nguyen* court concluded, "the conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design all contribute to whether a reasonably prudent user would have inquiry notice of a browsewrap agreement."  *Id*.

The situation envisioned by the *Nguyen* court is one in which Plaintiffs have been given the full contract to review in the first place, but somehow, through either inattentiveness or neglect, failed to review the complete document. That is clearly not the case here, based on the only admissible and relevant testimony on that subject before the Court.  As Plaintiffs' declarations show, they were only given the signature page of the AMA. There was neither actual nor inquiry

notice of the arbitration provision. Therefore, a case such as *Nguyen* is not applicable here. Furthermore, other cases cited by Defendants, such as *Knutson v. Sirius XM Radio Inc.* (9th Cir. 2014), 771 F.3d 559 (in which "the party failed to read [the terms of the contract] before signing" [Opp. at 5]), or *Knepper v. Ogletree, Deakins, Nash, Smoak & Stewart, P.C.* (N.D. Cal., Jan. 9, 2019) No. 18-cv-00303-WHO (in which "the court found that just because the plaintiff may not have seen it does not preclude enforcement" [Opp. at 5]), frame this as an issue of neglect on the part of the signer, who, in the cited cases, failed to read the contracts at issue. None of the cases cited by Defendants are analogous to the present scenario, in which Plaintiffs were presented with only the signature page of the AMA as part of the sign-up packet of various documents, and thus had no way of knowing that the AMA purportedly contained an arbitration provision.  Instead, Plaintiffs' declarations show a concerted effort (whether it be nefarious or otherwise does not matter for this motion) by Defendants to keep the full contracts out of Plaintiffs' hands, even having upline associates sometimes complete the docusign process for downline associates, as in the case of Ms. Abtahi's AMA.

Defendants have not shown any evidence of actual or inquiry notice of the arbitration provisions at issue. On the contrary, the cases that Defendants cite show that a reasonably prudent person signing the "sign-up packet" would not have had any notice that they had been provided only the signature page of the AMA, or that they had been denied the opportunity to review the full contract, including the arbitration provision.  These Plaintiffs are those reasonably prudent persons, and they were victims of the Defendants' sign-up process.

### 1.   Defendants have not met the burden of proving the existence of an arbitration agreement

The initial burden is on the party petitioning to compel arbitration to prove the existence of the agreement by a preponderance of that evidence. *Villacres v. Molinari* (2005) 132 Cal.App.4th 1223, 1230. (*See also Rosenthal v. Great Western Fin. Securities Corp.*, 14 Cal.4th 393, 413; *Engalla v. Permanente Medical* Group (1997) 15 Cal.4th 951, 972.) Once the petitioner has met that burden, the burden shifts to the party opposing arbitration, to "produc[e] evidence of, and prov[e] by a preponderance of the evidence, any fact necessary to the defense." *Rosenthal v. Great Western Fin. Securities Corp*. (1996) 14 Cal.4th at p. 413.

All of the Plaintiffs independently recall the same facts surrounding execution of the AMA when they first contracted signed up with Defendants following the recruitment process.  At that time, they were all presented with a small packet of paper documents to sign in order to become Associates.  Plaintiffs' Decl. at ¶ 2.  Those packets contained, among other things, an untitled single-page document discussing the use of photographs by the company.  *Id*.  Thus, there was a reason for the Plaintiffs to be signing this page, as it included a release of photographic rights requested by the Defendants in order to work for them.  While this untitled document contains the words "Associate Membership Agreement" in tiny letters on the very bottom left hand corner of the page, nowhere on it or anywhere else in the packet of materials provided to Plaintiffs is there any mention of arbitration. This is because Plaintiffs were not shown or provided with the rest of the AMA when they signed the photographic release signature page, and therefore had no idea they were purportedly waiving all rights to litigate their disputes with Defendants in a court of law. They signed that paper document, as well as the other seven or eight single page documents presented to them, and that was all they saw of the AMA.  Their information was then entered by other people into the WFG system.

In fact, Plaintiffs all state that it was Defendants' custom and practice to recruit and sign up new Associates by presenting them with this pre-culled packet of paper documents that contained only the signature page of the AMA, as that is how they were later trained to sign up hundreds, if not thousands, of new Associates.  Yeomans Decl. at ¶ 13, Chraibi Decl. at ¶ 12, R. Jenkins Decl. at ¶ 11, D. Jenkins Decl. at ¶ 8, Bradford Decl. at ¶ 7, Abtahi Decl. at ¶ 13, Rodriguez Decl. at ¶ 5.  Therefore, not only were Plaintiffs not presented with the full AMA when they began working for Defendants, it is probable that none of the putative class members or aggrieved employees saw it before signing up to be an Associate.

For the AMAs attached to Schaad's declaration that were purportedly completed and signed by typewritten signature, they contained instructions that the forms were "[t]o be completed by the Senior Marketing Director," and not by the Plaintiffs.  *See* Schaad Decl., Ex, 2 (Abtahi); Ex. 3 (Bradford); Ex. 4 (D. Jenkins); Ex. 5 (R. Jenkins); Ex. (Rodriguez), Ex. 7 (Chraibi), Ex. 8 (Yeomans).  Importantly, Plaintiffs acknowledge that Senior Marketing Directors—not new

Associates themselves—did, in fact, fill in these AMAs for the new recruits after the new recruits signed and completed the initial packet of paper documents that was presented to them, as that was Defendants' recognized policy and procedure. Yeomans Decl. at ¶ 16.  In Ms. Abtahi's case, someone else even signed the documents for her, without her consent, as evidenced by the reversal of her first and last names (or first and last initials) throughout the document.

Plaintiffs' explanation of the process is most strongly corroborated by the AMA attached to Schaad's declaration filed in support of Defendants' Motion as Exhibit 7, which was offered as a "true and correct copy" of Plaintiff Chraibi's AMA. Plaintiff Chraibi's is the one AMA that was signed in ink, consistent with the process Plaintiffs describe. A close look at his purported AMA reveals that the signature page contains a facsimile header indicating that it was page 6 of 9, yet *none of the other pages in that exhibit that purport to be the entirety of his AMA contain a facsimile header across the top of the page*. *See* Schaad Decl., Ex. 7, at p. 7. Additionally, the exemplar AMA that has been submitted by the Defendants, Exhibit 1 to the Schaad declaration, contains 23 pages with its attachments.  This is entirely consistent with the Plaintiffs' testimony that the AMA signature page was part of a larger packet of other sign-up documents presented to them, that did not contain any part of the AMA other than the signature page, and that the complete agreement including the full AMA was later assembled by Defendants.

### 2.     Evidentiary Objections Pursuant to Local Rule 7-3(a)

The Motion states, "[Other agents] explain what actually happens before someone contracts with Defendants: he or she can review the full AMA (now Agent Agreement), including the Arbitration Agreement contained therein." Motion to Compel, Dkt. No. 73, p. 6-7. In support of this statement, Defendants have attached the declarations of Andrew Schaad and seven nonparty employees. None of these declarations directly contradict the evidence provided by Plaintiffs that they were not given the complete AMA prior to signing.  The motion is necessarily directed only to the seven plaintiffs addressed in the motion.  What may or may not have happened regarding the other declarants, many from differing offices, is wholly irrelevant to this proceeding.  Such declarations create nothing more than an irrelevant side-show which does not in any way assist in this motion as to these seven plaintiffs.  As such they are objected to and should be stricken from

the record. As noted above, for reasons only they know, the Defendants have chosen not to file any declarations from the people who actually signed up these seven plaintiffs, nor from their branch managers who might have relevant testimony, nor from any other office personnel.

Under FRE 602, a "witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." Here, Defendants address the Plaintiffs' actual working conditions in California through Mr. Schaad's declaration, even though he lives and works in Georgia. *See* Schaad Decl., ¶¶ 6-16. Mr. Schaad and the non-party employees do not and cannot lay the proper foundation for these matters. Mr. Schaad only vaguely testifies that he is familiar with Defendants' operations and the "files for the agents like Plaintiffs." See Schaad Decl.,¶ 1. He admits that he only knows the facts in his declaration "based on those records." See Schaad Decl., ¶1. The only exhibits attached to Mr. Schaad's declaration are samples of the AMA and the Agent Agreement, neither of which are signed by an agent. Schaad Decl. ¶¶ 5, 9-15. Remarkably, Mr. Schaad does not testify that he has any personal knowledge of the actual working conditions, recruiting processes, or the sign-up procedures faced by these seven Plaintiffs in California outside of anything in the stated unsigned agreements attached to his declaration. In fact, he previously testified at deposition that he had no personal knowledge at all about these seven plaintiffs. The Declaration therefore lacks foundation and the declarant lacks personal knowledge of the facts set forth in the declaration at ¶¶ 6-16; *see also* Schaad Depo at 29:5-30:4. (FRE 602).

As for the non-party employees who signed declarations in support of Defendants' Motion, none of them have personal knowledge of how the AMA was presented to these Plaintiffs. Each of these declarations states, "I personally know of the Associate Membership Agreement, how Defendants presented it to me, and how I have helped Defendants present it to others in California." *See* Declarations of Charlier, Cruz, Dao, Day, Devers, Rogers, and Villalobos in Support of Motion to Compel Arbitration, ¶ 5. None of these declarations contradict in any way the claims of Plaintiffs, as the Motion incorrectly asserts. These declarations only speak to the personal experiences of a handful of Defendants' employees, none of whom took part in the process of having Plaintiffs review and sign their AMAs. There is no evidence presented in these declarations

that directly challenges what Plaintiffs have set forth in their own declarations. Defendants might claim that these declarations are admissible under FRE 406, showing an organization-wide "routine practice," if that was Defendants' goal, as the declarations only include statements about the declarant's individual sign-up experience and the AMAs. No foundation is laid by this handful of declarants, out of literally thousands of new associates, to support a claim by Defendants that giving out complete AMAs for review and signature was a company-wide practice. Thus, the experiences of these non-party declarants are irrelevant to the experience of the Plaintiffs, which remain uncontested.

### C.   MDA'S "GOVERNING LAW" PROVISION SUPERSEDES AMA'S "GOOD FAITH ARBITRATION" PROVISION

Defendants' Petition must further be denied because the AMA's arbitration provision was subsequently superseded by the MDA. Section I of the MDA, "Scope of this Agreement," states, "Unless the provisions of this Agreement expressly provide otherwise, the terms and conditions of your Associate Membership Agreement remain in force."

The "Governing Law" section of the MDA represents just such an express change envisioned by Section I. While the earlier AMA contains a provision that "any Grievance shall be resolved exclusively by Good Faith Arbitration," the later-signed MDA states that "this Agreement will be governed by the laws of the State of Georgia" and that "the parties agree that *state and federal courts of Georgia shall have exclusive jurisdiction of any litigation between the parties*" (emphasis added). The MDA's venue clause supersedes the earlier contract's arbitration provision, which applied to all disputes governed by the AMA, and allows parties to settle disputes in state and federal court rather than in arbitration. This clause "expressly" provides for the settling of disputes in court, directly contradicting the AMA provision regarding arbitration. In their motion, Defendants do not provide any justification for compelling arbitration when their own MDA specifies that remedies can and should be pursued in court.  The fact that this Court previously denied transfer does not in any way impact the conclusion that the matters should be resolved in Court, and not arbitration – it should just be this Court.

### D.   THE ARBITRATION AGREEMENT IS UNENFORCEABLE DUE TO UNCONSCIONABILTY

The arbitration provision in the AMA is further unenforceable because it is procedurally

and substantively unconscionable, and thus arbitration cannot be compelled. As the Ninth Circuit has noted: "The Supreme Court's holding that the FAA preempts state laws having a 'disproportionate impact' on arbitration cannot be read to immunize all arbitration agreements from invalidation no matter how unconscionable they may be, so long as they invoke the shield of arbitration." *Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 927 (9th Cir. 2013); *see also Kilgore v. KeyBank, Nat. Ass'n*, 673 F.3d 947, 963 (9th Cir. 2012) ("*Concepcion* did not overthrow the common law contract defense of unconscionability whenever an arbitration clause is involved. Rather, the Court reaffirmed that the savings clause preserves generally applicable contract defenses such as unconscionability, so long as those doctrines are not 'applied in a fashion that disfavors arbitration.'") To be unenforceable, a contract must be both procedurally and substantively unconscionable.  *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal.4th 83, 114, 99 Cal.Rptr.2d 745, 6 P.3d 669 (2000).

In *Chavarria*, the court determined that "California law regarding unconscionable contracts, as applied in this case, is not unfavorable towards arbitration, but instead reflects a generally applicable policy against abuses of bargaining power." *Id.* The FAA provides that arbitration agreements are generally "valid, irrevocable, and enforceable." 9 U.S.C. § 2.  However, when grounds "exist at law or in equity for the revocation of any contract," courts may decline to enforce such agreements. *Id.*  In Plaintiffs' case, certain of the unconscionable clauses in the AMA, which permit Defendants alone to seek injunctive remedies, are not arbitration-specific. Therefore, California defenses against contract formation, including unconscionability, are valid grounds for a court to refuse to enforce an agreement to arbitrate.

## 1.   <u>Purported agreement to arbitrate is procedurally unconscionable</u>

Procedural unconscionability exists when the underlying agreement is a "contract of adhesion" in which the stronger party drafts the contract and presents it to the weaker party on a "take it or leave it" basis.  *Serafin v. Balco Properties Ltd., LLC* (2015) 235 Cal.App.4th 165, 179. In addition to determining whether the underlying agreement is a contract of adhesion, the courts, to determine procedural unconscionability, focus on two factors: oppression and surprise.  *Tiri v. Lucky Chances, Inc.* (2014) 226 Cal.App.4th 231, 246.  "Oppression" arises from an inequality of

bargaining power, which allows for no real negotiation and results in "an absence of meaningful choice," while "surprise" involves "the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms." *Id.* (*See also Zullo v. Superior Court* (2011) 197 Cal.App.4th 477, 484; *Carlson v. Home Team Pest Def., Inc.* (2015) 239 Cal. App. 4th 619, 631.)

In *Carlson*, as in Plaintiffs' case, the degree of procedural unconscionability is high, mainly because the plaintiff was not provided with the arbitration agreement when she signed the contract: "The Agreement referenced the Dispute Resolution Policy, but it was not available to Carlson [...] In fact, Carlson was never provided with a copy of the Policy while she was employed by Home; instead, she first saw it when Home's attorneys sent it to her after she filed the underlying action." *Id.* at 633. The *Carlson* court found that this "materially more egregious" than facts in cases where an employee was actually provided with the text of the arbitration agreement prior to signing. *Id.*

Defendants claim that there is no "surprise" in the AMA because it does not contain hidden terms and the arbitration provision is titled in bold font. Dkt. No. 73, p. 10. However, this only means that an arbitration provision would not surprise an Associate *who had the opportunity to review the entire AMA before signing*. As explained at length above, Plaintiffs were only given a single page to sign, with no indication or notice of a greater contract to which they were agreeing. None of the Plaintiffs knew, at the time that they were signing only one page of the AMA, that there was an arbitration agreement included in the overall agreement. This surprise at learning of the arbitration provision in a contract that they were not given to review in the first place is the very definition of procedurally unconscionable. Given the facts in *Carlson* were "egregious" because an employee was not informed of the content of the Policy even when she asked, then the facts in the present case, where Plaintiffs were never provided with the arbitration agreement at all nor told about its existence, points to an even greater degree of procedural unconscionability.

### (a) The AMA is an oppressive contract of adhesion that was not provided to Plaintiffs

A contract of adhesion is "a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Neal v. State Farm Ins. Cos.* (1961) 188 Cal.App.2d 690, 694.

17

The oppression component arises from an "inequality of bargaining power … and an absence of real negotiation or a meaningful choice on the part of the weaker party." *Kinney v. United HealthCare Services, Inc., supra*, 70 CA4th at 1329; *Nyulassy v. Lockheed Martin Corp*. (2004) 120 CA4th 1267, 1281; *Sanchez v. Western Pizza Enterprises, Inc*. 172 CA4th at 173-174—("inequality in bargaining power between the low-wage employees and their employer makes it likely that the employees felt at least some pressure to sign the arbitration agreement.") When the weaker party in a contract is presented the clause and told to "take it or leave it" without the opportunity for meaningful negotiation, oppression, and therefore procedural unconscionability, are present. *Szetela v. Discover Bank* (2002) 97 CA4th 1094, 1100; *Martinez v. Master Protection Corp*. (2004) 118 CA4th 107, 114; *Ingle v. Circuit City Stores, Inc*. (9th Cir. 2003) 328 F3d 1165, 1171-1172 (applying Calif. State law).

Here, Defendants drafted the agreement and presented the packet containing the AMA's signature page to Plaintiffs on a "take it or leave it" basis.  Plaintiffs' declarations reflect the reality that they had a stark choice: either sign the AMA signature page as part of the sign-up packet, or reject the agreement and not take the job.  Yeomans Decl. at ¶ 7, Chraibi Decl. at ¶7, R. Jenkins Decl. at ¶ 6, D. Jenkins Decl. at ¶ 6, Bradford Decl. at ¶ 4, Abtahi Decl. at ¶ 7, Rodriguez Decl. at ¶ 5. As with any contract of adhesion, there was no meaningful opportunity to negotiate the terms of the agreement. *Id.* Even if Plaintiffs had been permitted to view the entire AMA, the lengthy document requires the signer to reference several different paragraphs, with the terms of the arbitration agreement found only in the "Glossary and Explanation of Terms" section.

Another type of oppression has been found in cases where one side fails to provide a copy of the arbitration rules to which the employee would be bound. *Samaniego v. Empire Today, LLC* (2012) 205 Cal.App.4th 1138, 1146; *Trivedi v. Curexo Technology Corp*. (2010) 189 Cal.App.4th 387, 393–394; *see Carlson v. Home Team Pest Defense, Inc*. (2015) 239 Cal.App.4th 619, 631–633); *Carmona v. Lincoln Millennium Car Wash, Inc*. (2014) 226 Cal.App.4th 74, 84–85; *Zullo v. Superior Court* (2011) 197 Cal.App.4th 477, 485–486. In each of these cases, the failure to provide a copy of the governing rules "contributes to oppression because the employee 'is forced to go to another source to find out the full import of what he or she is about to sign and must go to that

---

effort prior to signing.' " (*Carmona*, at p. 84.) The level of oppression is increased when, as here, the employer not only fails to provide a copy of the governing rules, but also fails to clearly identify which rules will govern so the employee could locate and review them. (*Zullo*, at p. 486, fn. 3 ["oppressive nature of the agreement" increased because AAA rules identified in arbitration agreement did not exist]; Carlson, at p. 633 ["the failure to disclose the terms of arbitration and the applicable rules also constitute surprise"].)

The AMA's Good Faith Arbitration provision states that any arbitration between the parties will be brought in accordance with "rules" that WFG defines as "The Commercial Arbitration Rules of the American Arbitration Association, as in effect at the time of the occurrence of any Grievance." Schaad Decl., Ex. 1, Dkt. 73-5, p. 17. However, Defendants not provide the AMA to the Plaintiffs in the first instance, and, even if they had done so, employees would be forced to locate and review the rules on their own.

## 2.   <u>Purported agreement to arbitrate is substantively unconscionable</u>

"Substantive unconscionability" focuses on the terms of the agreement and whether those are "overly harsh" or "one-sided." *Little v. Auto Stiegler, Inc.* (2003) 29 CA.4th 1064, 1071; *Circuit City Stores, Inc.v. Najd* (9th Cir. 2002) 294 F.3d 1104, 1108 (applying California state law). In assessing substantive unconscionability, the "paramount consideration" is mutuality of the obligation to arbitrate. *Nyulassy v. Lockheed Martin Corp.* (2004) 120 CA4th 1267, 1287; *Pinela v. Neiman Marcus Group, Inc.* (2015) 238 CA4th 227, 241. An arbitration agreement imposed in an adhesive context lacks basic fairness and mutuality if it requires one contracting party, but not the other, to arbitrate all claims. *Armendariz*, 24 Cal. 4th at 117–18.

### (a)   "Extraordinary Relief" and "Equitable Relief" provisions in AMA render purported arbitration agreement unconscionable

The AMA contains two clearly unconscionable provisions: the "Extraordinary Relief" clause and the "Equitable Relief" clause. Schaad Decl., Ex. 1, Dkt. 73-5, pp. 15-16. Both of these clauses are designed to allow Defendants and Defendants only the option of circumventing the arbitration process for the claims they felt were important enough to them to go the extreme position of excluding themselves from arbitration for those claims, while requiring all employees to submit those very claims to the arbitration process.

Courts have found one-sided employer-imposed arbitration provisions unconscionable where they provide that employee claims will be arbitrated, but the employer retains the right to file a lawsuit in court for claims it initiates." *Serafin v. Balco Properties Ltd., LLC* (2015) 235 Cal.App.4th 165, 181.

In *Carbajal v. CWPSC, Inc.* (2016) 245 CA4th 227, 248-252, 199, an arbitration provision in an employment agreement granted the employer the right to seek injunctive relief. The arbitration provision was found to be substantively unconscionable. The *Carbajal* court cited a case that involved a carve-out provision allowing *either* party to seek injunctive relief in court ("'it is far more likely' the employer will seek injunctive relief in court to stop an employee from breaching a nondisclosure or noncompetition agreement than the employee will seek injunctive relief in aid of his or her claims for wrongful termination, illegal discrimination, or unpaid wages.") *Id.*, citing *Trivedi v. Curexo Technology Corp.,* 189 Cal.App.4th at 396–397; see *Carlson v. Home Team Pest Defense, Inc.,* 239 Cal.App.4th at 634–635 [arbitration agreement substantively unconscionable because it included carve-out provision allowing employer to seek injunctive and other equitable relief in court]; *Samaniego v. Empire Today, LLC,* 205 Cal.App.4th at 1147–1148 [same]; *Martinez v. Master Protection Corp.* (2004) 118 Cal.App.4th 107, 115 [same]; *Abramson v. Juniper Networks, Inc.* (2004) 115 Cal.App.4th 638, 665 [same]; *Mercuro v. Superior Court* (2002) 96 Cal.App.4th 167, 176 [same].)

The "Extraordinary Relief" and "Equitable Relief" provisions of the AMA are identical to the carve-out provisions in the above cases that allowed only the stronger party imposing the terms of the contract on the weaker party to seek injunctive relief. Here, Plaintiffs were not only pressured to sign contracts without any meaningful opportunity to negotiate; they were also given a one-sided agreement that allowed only Defendants to seek equitable or injunctive relief outside of arbitration. Even worse than in a case such as *Trivedi*, where the injunctive relief provision was at least available to all parties, the provision here is not available as a form of relief for Plaintiffs. The one-sided nature of the "Extraordinary Relief" and "Equitable Relief" provisions, and its effect of binding Plaintiffs to one type of remedy while giving Defendants limitless access to relief both legal and arbitral, renders the agreement substantively unconscionable.

Here, as this Court well knows due to the injunction previously sought by the Plaintiffs, the right to seek injunctive relief in Court is often critical.  While the Court did not reach the arbitration issue when it denied the requested injunction, the Defendants did oppose the motion in part based on the arbitration prohibition, knowing full well that they themselves could seek a Court-ordered injunction with impunity. The one-sided nature of this important relief, being retained by only the Defendants herein, emphasizes its substantive unconscionability.

**(b)** **The Arbitration Agreement grants the arbitrator the authority to award attorneys' fees and costs to the prevailing party, irrespective of whether the action was brought with merit**

Courts have found that provisions in arbitration agreements that purport to impose an obligation on the non-prevailing employee to pay the attorneys' fees of the prevailing employer, without considering whether the action was brought in bad faith, are unconscionable. In *Trivedi v. Curexo Technology Corp.* (2010) 189 Cal. App. 4th 387, 394 (disapproved on other grounds in *Baltzar v. Forever 21, Inc.* (2016) 62 Cal.4th 1237), the Court found a provision in an arbitration agreement that "allows for the recovery of attorney fees and costs by the prevailing party in an arbitration" to be substantively unconscionable because it improperly gave the arbitrator the power to assess attorney fees against a non-prevailing plaintiff, regardless of whether the FEHA action was frivolous, unreasonable, without foundation, or brought in bad faith. Similarly, in *Ajamian v. CantorCO2e, L.P.* (2012) 203 Cal. App. 4th 771, 797, the Court held that the attorneys' fees provision in the arbitration agreement was unconscionable and unenforceable, in part, because it imposed on the employee the obligation to pay the employer's attorneys' fees where she would have no such obligation under her California statutory claims.

Here, the Arbitration Agreement states, "If any Party hereto commences an action or arbitration to enforce any of the provisions hereof, the prevailing Party in such action shall be entitled to an award of its reasonable attorneys' fees and all costs and expenses incurred in connection therewith." Schaad Decl., Ex. 1, Dkt. 73-5, p. 12. This provision, similar to the fee provisions in *Trivedi* and *Ajamian* is substantively unconscionable because it gives the arbitrator the power to assess attorneys' fees and costs against a losing plaintiff-employee, regardless of whether the action was brought in bad faith. Further, this provision is inconsistent with Labor Code

§ 218.5(a), which states that employers, even if they are the prevailing party in an action brought for the nonpayment of wages, are not entitled to the recovery of attorneys' fees and costs unless the court finds that the employee brought the action in bad faith. Additionally, the minimum wage and overtime claims asserted in the First Amended Complaint are governed by Labor Code 1194.1, which contains a clear and unambiguous one-way fee shifting statute.  Because the attorneys' fees provision in this arbitration agreement fails to consider whether the action was meritorious, and violates Section 1194.1, it is unconscionable and unenforceable.

### (c)    Arbitration agreement's discovery provisions render purported arbitration agreement unconscionable

Adequate discovery is indispensable for the vindication of statutory claims. *Fitz v. NCR Corp.* (2004) 118 Cal.App.4th 702, 715. Arbitration agreements must "ensure minimum standards of fairness" so employees can vindicate their public rights.  *Id.* at 716, citing *Little v. Auto Stiegler, Inc.* (2003) 29 Cal.4th 1064, 1080. The CAA provides, in part: "After the appointment of the arbitrator ..., the parties to the arbitration shall have the right to take depositions and to obtain discovery regarding the subject matter of the arbitration, and, to that end, to use and exercise all of the same rights, remedies, and procedures ... as if the subject matter of the arbitration were pending before a superior court...." Code Civ. Proc., § 1283.05, subd. (a).  In federal court, as well as in California state court, an arbitration agreement leaving discovery to the arbitrator's discretion, "without any indication of what kind of law or rules the arbitrator will apply to limit that discretion," has been found to render the agreement substantively unconscionable.  *O'Hanlon v. JPMorgan Chase Bank, N.A.*, 2015 WL 5884844, at *6 (C.D. Cal. Oct. 7, 2015).

The AMA does not provide for adequate discovery under either the CAA or the standard posed by the court in *O'Hanlon*.  Under the "Good Faith Arbitration" clause, the agreement states, "Discovery (in the form of production of documents and depositions) of evidence pertinent and material to the Grievance, may be ordered by the arbitrator(s). The discovery shall be on such terms and at such times and locations as ordered by the arbitrator(s) and their orders may be enforced by courts of competent jurisdiction."  Schaad Decl., Ex. 1, Dkt. 73-5, p. 16.  Since the AMA only provides for discovery at the arbitrator's discretion, without any indication of what kind of law or rules the arbitrator will apply to limit that discretion. Thus, the discovery provision

in the arbitration agreement renders the entire agreement substantively unconscionable.

**(d)** **Unconscionable Provisions Cannot Be Severed From The Arbitration Agreement**

Civil Code section 1670.5, subdivision (a) provides that "[i]f the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." Comment 2 of the Legislative Committee comment on section 1670.5, incorporating the comments from the Uniform Commercial Code, states: "Under this section the court, in its discretion, may refuse to enforce the contract as a whole if it is permeated by the unconscionability, or it may strike any single clause or group of clauses which are so tainted or which are contrary to the essential purpose of the agreement, or it may simply limit unconscionable clauses so as to avoid unconscionable results." (Legis. Com. com., at 9 West's Ann. Civ.Code (1985 ed.) p. 494 (Legislative Committee comment).)

Where, as here, an arbitration agreement contains multiple unconscionable provisions—in this case, both the "Extraordinary Relief" section and the "Equitable Relief" section, as well as the illegal attorney's fee clause—severance cannot save it. The *Armendariz* Court noted that a court's power to reform an arbitration agreement is "limited to instances in which parties make mistakes, not to correct illegal provisions." 24 Cal.4th at 125. Furthermore, the *Armendariz* court wrote, "if the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced" since "multiple defects [in an agreement] indicate a systematic effort to impose arbitration on an employee not simply as an alternative to litigation, but as an inferior forum that works to the employer's advantage." *Id*. at 124. "The fact that an arbitration agreement contains more than one unlawful provision may indicate a systematic effort to impose arbitration on an employee ... as an inferior forum that works to the employer's advantage." *Ontiveros v. DHL Exp. (USA) Inc*. (2008) 164 Cal.App.4th 494, 515.

In this case, the two "Extraordinary Relief" and "Equitable Relief" provisions, which effectively exempt Defendants from the litigation waiver specifically forced upon Plaintiffs, plus the illegal attorney's fee provision, indicate a systematic effort to impose arbitration on an

employee not simply as an alternative to litigation, but as an inferior forum that works to the employer's advantage. This effort is reinforced by the extreme level of procedural unconscionability of the AMA caused by Defendants' failure/refusal to provide Plaintiffs with the full contract, including the arbitration provision's "Extraordinary Relief," and "Equitable Relief" provisions, nor the attorney's fee impropriety, prior to signing.

Furthermore, in the case of the agreement's lack of mutuality, such permeation is indicated by the fact that the court cannot strike or restrict any single provision in order to remove the unconscionable taint from the agreement. Rather, the court would have to reform the entire contract by augmenting it with additional terms. Civil Code section 1670.5 does not authorize such reformation by augmentation, nor does the arbitration statute. Code of Civil Procedure section 1281.2 authorizes the court to refuse arbitration if grounds for revocation exist, not to reform the agreement to make it lawful. Nor do courts have any such power under their inherent, limited authority to reform contracts. *See Kolani v. Gluska* (1998) 64 Cal.App.4th 402, 407–408 (power to reform limited to instances in which parties make mistakes, not to correct illegal provisions.

Because these multiple indicia of unconscionability cannot be cured through severance, and because the unconscionability of the injunctive relief provisions, plus the illegal attorney's fee and discovery provisions, so permeate the purported agreement to arbitrate, the only cure for this unconscionability is to void the entire agreement. *See Armendariz*, 24 Cal. 4th at 124–25.

**E.     THE COURT SHOULD ALLOW PLAINTIFF TO CONTINUE LITIGATING THE NONARBITRABLE PAGA ACTION**

The trial court's discretion is involved in deciding a request to stay or deny arbitration that is sought under section 1281.2 ("the court may delay its order to arbitrate until the determination of such other issues or until such earlier time as the court specifies"). *Independent Ass'n of Mailbox Center Owners, Inc. v. Superior Court* (2005) 133 Cal. App. 4th 396, 413.

If this Court is inclined to grant Defendant's motion as to Plaintiffs' Labor Code claims, this Court should not stay the action, pending arbitration. The interests of Plaintiffs' Labor Code claims differ from those of his PAGA claim. Under PAGA, Plaintiff stands in the shoes of the LWDA to seek redress on behalf of "similarly situated" employees. The court in *Iskanian v. CLS Transportation Los Angeles, LLC,* 59 Cal. 4th 348 (2014), analogized a PAGA action to *qui tam*

24

actions, in which a private party brings an action on behalf of the government. "The PAGA conforms to [the] traditional criteria of qui tam claims, except that a portion of the penalty goes not only to the citizen bringing the suit but to all employees affected by the Labor Code violation. The government entity on whose behalf the plaintiff files suit is always the real party in interest in the suit." *Iskanian*, 59 Cal.4th at p. 382. Accordingly, the *Iskanian* court found that PAGA is not preempted by the FAA because the purpose of the FAA differs from PAGA. *Iskanian*, 59 Cal.4th at 388 ("[The FAA] does not aim to promote arbitration of claims belonging to a government agency, and that is no less true when such a claim is brought by a statutorily designated proxy for the agency as when the claim is brought by the agency itself.")

Under PAGA, Plaintiffs are pursuing the interests of the government in ensuring Defendants' compliance with the law. A private attorney general action is fundamentally a law enforcement action. *Huff v. Securitas Sec. Servs. USA, Inc.*, 23 Cal. App. 5th 745, 753 (2018). The goals of the LWDA in enforcing the Labor Code on behalf of the public via the prosecution of the PAGA claim should not be delayed in order to satisfy the FAA's purpose of promoting the arbitration of private interests, i.e., Plaintiff's individual Labor Code claims. The arbitration of the individual labor code claims is separate and apart from the law enforcement goals of the PAGA statute. It does not require the employee to claim that any economic injury resulted from the alleged violations. *Kim v. Reins Int'l Cal., Inc.,* 9 Cal. 5th 73, 84. (2020) Simply put, a plaintiff's inability to obtain individual relief (via arbitration or otherwise) is not necessarily fatal to the maintenance of a PAGA claim. *Kim*, 9 Cal. 5th at 85. To enter a stay of this action in favor of arbitration would unduly prejudice the state's rights in pursuing this action (evidence may be compromised during the delay) and undermine the law enforcement aims of this litigation. Therefore, if this Court enforces the Arbitration Agreement, it should exercise its discretion under section 1281.2(d) to allow Plaintiffs to contemporaneously litigate the PAGA claim and to arbitrate their Labor Code claims and thus, to not stay Plaintiffs' PAGA claim.

## III.    CONCLUSION

For the foregoing reasons, Defendants' motion to compel arbitration should be denied.

DATED:  July 30, 2020                    **MARLIN & SALTZMAN, LLP**

By:  _s/  Stanley D. Saltzman _____
    Stanley D. Saltzman, Esq.
    Karen I. Gold, Esq.
    Joel M. Gordon, Esq.

*Attorneys for Plaintiffs, the putative Class, and Aggrieved Employees*

PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION