1

2

3

4                              UNITED STATES DISTRICT COURT

5                            NORTHERN DISTRICT OF CALIFORNIA

6

7     TRICIA YEOMANS, et al.,                    Case No.  19-cv-00792-EMC

8                    Plaintiffs,

9              v.                                **ORDER DENYING DEFENDANTS'
                                                 MOTION TO COMPEL
10    WORLD FINANCIAL GROUP                       ARBITRATION**
      INSURANCE AGENCY, INC., et al.,
11                                               Docket No. 73
                     Defendants.

12

13

14                          **I.      INTRODUCTION**

15          Plaintiffs[1] filed a putative class action lawsuit against Defendants World Financial Group

16   Insurance Agency Inc. and World Financial Group Inc. (collectively, "Defendants"), alleging,

17   *inter alia*, violations of the California Labor Code, the California Business and Professional Code,

18   and California Wage Orders based on Defendants' purported misclassification of Plaintiffs as

19   independent contractors, as opposed to employees.  Defendants have now filed a Motion to

20   Compel Arbitration, Dismiss Class Claims, and Stay Case.  *See* Docket No. 73 ("Mot.").

21                          **II.     BACKGROUND**

22   A.     Factual Background

23          Plaintiffs allege the following.  Defendants represent themselves as a financial- and

24   insurance-products marketing company; they recruit individuals as "Associates" and purport to

25   give people the tools "to build and operate their own financial services business."  First Amended

26   Complaint ("FAC") ¶ 1, Docket No. 23.  However, Plaintiffs assert that "Defendants conduct their

27   _____

28   [1] Named plaintiffs are Tricia Yeomans, Ismail Chraibi, Adrian Rodriguez, Robert Jenkins,
     Dorothy Jenkins, Cameron Bradford, and Fatemeh Abtahi (collectively, "Plaintiffs").

business by way of a massive pyramid scheme," wherein recruiting new Associates is one of the "main factors involved in achieving promotions." *Id.* ¶ 2. Once someone is an Associate, Defendants pressure that person to "purchase Defendants' financial and insurance products" and to "sell financial and insurance products to the new Associates." *Id.* ¶ 3.

Central to Plaintiffs' case is their allegation that "Defendants have unlawfully misclassified Associates as 'independent contractors' rather than as employees" in order to further increase company profits. *Id.* ¶ 4. Specifically, each Associate is "required to sign identical, non-negotiable Associate Membership Agreements ('AMAs')," which "set forth uniform rules and policies promulgated by Defendants, which subject Associates to strict control." *Id.* ¶ 5. "Plaintiffs and Class Members signed the AMAs." *Id.* Plaintiffs also contend that "Defendants completely control the overall operation of the business" and "retain the exclusive authority to hire and fire every Associate." *Id.* ¶¶ 6, 7. Furthermore, because of this classification, Associates earn only commissions, not minimum wage, and they bear the burden of business costs, which Defendants might otherwise bear. *Id.* ¶¶ 8, 9. In addition, Associates are improperly deprived of the protection of workers' compensation, the benefits of overtime pay, and meal and rest breaks. *Id.* ¶¶ 9, 10.

B.    The Arbitration Agreement

The arbitration provision at issue here is contained in the AMA. *See* Docket No. 73-5 (sample Associate Membership Agreement; the "AMA"). Some of the relevant terms are contained in the AMA itself, while others are explained in greater detail in a glossary appended to the AMA.

The body text of AMA's arbitration provision provides: "The Parties agree that, except as specifically provided to the contrary in this Agreement, any Grievance shall be resolved exclusively by Good Faith Arbitration." *Id.* at 4, art V. It also sets forth that Defendants, although not Associates, can seek some forms of "extraordinary relief" through the courts. *Id.*, art VI ("The Associate acknowledges that WFG would suffer extremely costly and irreparable harm, loss and damage if any of the provisions of this Agreement are violated by the Associate. The Associate agrees that WFG shall be entitled to seek Extraordinary Relief to temporarily enjoin violations by

2

the Associate of this Agreement and that WFG may seek Extraordinary Relief in the federal and state courts of the State of Georgia, in any court of competent jurisdiction outside the State of Georgia, as well as in Good Faith Arbitration and if justice requires, in more than one of them, all without having to first comply with the requirements of Article V.  The specifics of this Article VI shall not be deemed to preclude or narrow the judicial or arbitral powers regarding Extraordinary Relief.").  It also provides the awarding of attorneys' fees for the party that prevails in arbitration. *Id.* at 5, art IX, ¶ J ("If any Party hereto commences an action or arbitration to enforce any of the provisions hereof, the prevailing Party in such action shall be entitled to an award of its reasonable attorneys' fees and all costs and expenses incurred in connection therewith.").

Finally, the text of the AMA also contains a severability provision, which reads:  "If any part, section, clause, paragraph, term or provision of this Agreement shall be found to be void or unenforceable by any court or arbitration of competent jurisdiction, such finding shall have no effect upon any other part, section, clause, paragraph, term or provision of this Agreement."  *Id.*, ¶ H.

As noted above, many of the details related to arbitration are actually set forth in the "Glossary and Explanation of Terms" that is appended to the AMA, and not in the body of the AMA itself.  That Glossary explains that the term "Good Faith Arbitration" generally means:

> All Grievances shall be resolved by Good Faith Arbitration in accordance with the Rules, except that, or in addition to such Rules: i) in order to assure neutrality and impartiality of the arbitrator(s), and to preserve the confidentiality of proprietary information, the arbitrator(s) shall not be any present or past owner, officer, director, employee, consultant, associate, agent, registered representative, attorney or other representative of any insurance company, insurance broker or insurance agency, securities broker, securities dealer or mortgage company, investment advisor, or of any affiliate of any of them; ii) the Parties may be entitled to such discovery and protective orders as provided herein; iii) the locale where the arbitration shall be held is the principal head office of WFG in Duluth, Georgia or, if that location is not convenient for all Parties, they shall try to devise a way so that it is convenient, or if that location cannot be made convenient, at such other place as the Parties may agree, or, if they cannot agree, then as may be set by the Rules, as the case may be: iv) a transcript shall be made on the proceeding; and v) the arbitrator's(s') award shall state their findings of fact and conclusions of law.

Glossary and Explanation of Terms ("Glossary") at ¶ I, § 1, Docket No. 73-5.  The glossary also

defines the term "grievance" broadly, as "[a]ny controversy, claim or dispute arising out of or relating to this Agreement, between the Associate, on the one part, and WFG and/or any of the Corporate People, or any of them, on the other part."  Glossary at 3, ¶ J.  The "Rules" of arbitration are not spelled out in the body of the text quoted above.  Instead, one has to find the term "Rules" contained further back in the Glossary.  There, the Glossary defines Rules as, "Where required to be applied, the Commercial Arbitration Rules of the American Arbitration Association, as in effect at the time of the occurrence of any Grievance."  *Id*. at 3, ¶ S.

In addition, the Glossary contains a provision entitled "Waiver of Litigation," which reads as follows:

> The Parties acknowledge and agree that, except as specifically provided to the contrary in this Agreement, this Section I is and shall be the Parties' exclusive remedy for any Grievance arising out of or relating to this Agreement, or the breach thereof.  It is the intent of the Parties that, except as specifically provided to the contrary in this Agreement, to the fullest extent allowed by law all Grievances, including any claims or defense (whether created or governed by federal, state or local law, rule or regulation) shall be resolved in an arbitral rather than a judicial forum.  It is understood by the Parties that it is to their mutual benefit to submit Grievances that they are unable to resolve themselves for resolution by a neutral referee in an arbitral rather than a judicial forum.  Those Parties recognize that by choosing Good Faith Arbitration as the mechanism for resolving Grievances, each Party expects to ensure a more expeditious and economical resolution of their Grievances than is available in most cases in a judicial forum.  Accordingly, except as specifically provided to the contrary in this Agreement, the Parties expressly waive the right to litigate in a judicial forum all Grievances and waive the right to trial by jury.  The Parties further agree that the findings of fact issued by the arbitrator(s), as reviewed, if applicable, shall be binding on them in any subsequent arbitration, litigation or other proceeding.

*Id*. at 2, ¶ I, § 4.

C.    Procedural Background

Plaintiffs filed this case in San Francisco Superior Court in December 2018.  Defendants removed to federal court in February 2019.  In June 2019, Plaintiffs filed a First Amended Class Action Complaint.  *See* Docket No. 23.  The FAC defines the putative class as "other similarly situated and aggrieved individuals in the business of selling securities and insurance or training to be in the business of selling financial and insurance products."  *Id*. ¶ 4.  Although Plaintiffs

United States District Court
Northern District of California

1    specify:  "All of the claims Plaintiffs assert for themselves and for the putative Class relate

2    exclusively to work performed within the State of California."  *Id.* ¶ 15.  Shortly after the FAC

3    was filed, Defendants filed a Motion to Transfer Case, seeking an order transferring the case to the

4    U.S. District Court for the Northern District of Georgia.  *See* Docket No. 24.

5          In their Motion to Transfer, Defendants relied on forum selection clauses in the parties'

6    various agreements.  *See* Defendants' Notice of Motion to Transfer Venue at 1, Docket No. 24.

7    However, this Court denied transfer on the grounds that the forum selection clauses violated

8    California public policy as expressed by California Labor Code section 925.  *See* Docket No. 55.

9    In relevant part, Section 925 of the California Labor Code provides:  "An employer shall not

10   require an employee who primarily resides and works in California, as a condition of employment,

11   to agree to a provision that would . . . [r]equire the employee to adjudicate outside of California a

12   claim arising in California, [or] [d]eprive the employee of the substantive protection of California

13   law with respect to a controversy arising in California."  Cal. Labor Code § 925(a).  After finding

14   that Section 925 applied to the parties' agreements, this Court concluded that the forum selection

15   clauses were voidable and that the factors of Section 1404(a) weighed against transfer.  *See*

16   Docket No. 55 at 16.

17         On April 28, 2020, Plaintiffs filed an *ex parte* Application for a Temporary Restraining

18   Order ("TRO"), seeking relief from what they alleged was Defendants' practice of terminating

19   associates and subsequently seeking to collect money owed to Defendants in the form of "Debit

20   Balances."[2]  *See* Docket No. 57.  On April 29, 2020, the Court denied that request, finding that

21   Plaintiffs had not stated a sufficient basis for *ex parte* relief.  *See* Docket No. 60.  However, the

22

23   [2] The term "Debit Balance" encompasses various debts Associates may owe to Defendants.  *See*
     Docket No. 57 at 10.  Debts are accumulated through, *e.g.*, charges imposed on Associates, such
24   as "a mandatory monthly fee of $25 to $180 to access the online platform" and "E&O insurance
     from WFG's captive insurance company at a cost of approximately $45 to $85 per month."  *See*
25   Docket No. 57-2 at ¶ 10.  In addition, as explained in the AMA, Debit Balances may also include:
     "expenses; license fees; commissions, and expenses that Associate is required to refund to WFG
26   because of Customer cancellations, rights of withdrawal, non-renewals, terminations, lapses or
     otherwise; Advance Commissions; Debit Balances of Associate's Downline Associate(s);
27   expenses and fees incurred by WFG in attempting to register prospective Downline Associates of
     Associate; WFG claims for indemnification against Associate; and other claims by WFG against
28   Associate; and any and all money and value which may be paid, advanced, or credited by or on
     behalf of WFG, to, or for the benefit of, Associate."  AMA, at 2, ¶ F.

1    Court converted the TRO application to a Motion for Preliminary Injunction and set the motion for

2    briefing and a hearing, which took place by Zoom on May 22, 2020.  *Id.*  After the hearing, the

3    Court denied Plaintiffs' motion for a TRO on the grounds that the issuance of class-wide relief

4    prior to the certification of the class is strongly disfavored.  *See* Docket No. 72 at 6 (citing *M.R. v.*

5    *Dreyfus*, 697 F.3d 706, 738 (9th Cir. 2012)).  It noted that none of the exceptions to the general

6    rule (that a court should not grant such relief prior to class certification) applied.  *Id.*  On June 18,

7    2020, Defendants moved to compel arbitration.  Docket No. 73.

### III.    LEGAL STANDARD

9        Under the Federal Arbitration Act ("FAA"), "[a] written provision in . . . a contract

10   evidencing a transaction involving commerce to settle by arbitration a controversy thereafter

11   arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such

12   grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The FAA

13   establishes "a liberal federal policy favoring arbitration agreements."  *Epic Sys. Corp. v. Lewis*,

14   138 S. Ct. 1612, 1621 (2018) (citing 9 U.S.C. § 2); *see also Blair v. Rent-A-Ctr., Inc.*, 928 F.3d

15   819, 825 (9th Cir. 2019) (quoting 9 U.S.C. § 2).  Courts "must place arbitration agreements on an

16   equal footing with other contracts . . . and enforce them according to their terms."  *AT&T Mobility*

17   *LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal citations omitted).

18       To determine "the validity of an arbitration agreement, federal courts apply state law

19   contract principles."  *Lau v. Mercedes-Benz USA, LLC*, No. CV 11-1940 MEJ, 2012 WL 370557,

20   at *2 (N.D. Cal. Jan. 31, 2012) (citing *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 892 (9th

21   Cir. 2002)).  However, arbitration agreements may "be invalidated by 'generally applicable

22   contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only

23   to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue."

24   *Concepcion*, 563 U.S. at 339.

25       Typically, "the question whether an issue is arbitrable . . . is 'an issue for judicial

26   determination . . . .'"  *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1208 (9th Cir. 2016) (citing

27   *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1072 (9th Cir. 2013)).  In other words,

28   "there is a presumption that courts will decide which issues are arbitrable; the federal policy in

United States District Court
Northern District of California

6

United States District Court
Northern District of California

1   favor of arbitration does not extend to deciding questions of arbitrability." *Oracle Am., Inc.*, 724

2   F.3d at 1072.  However, where "the parties clearly and unmistakably provide otherwise, the

3   question of whether the parties agreed to arbitrate" may be decided by an arbitrator. *AT&T Techs.,*

4   *Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986).  "Such clear and unmistakable

5   evidence of agreement to arbitrate arbitrability might include . . . a course of conduct

6   demonstrating assent . . . or . . . an express agreement to do so." *Momot v. Mastro*, 652 F.3d 982,

7   988 (9th Cir. 2011).

8                                  **IV.     DISCUSSION**

9           Defendants argue that Plaintiffs each signed the AMA, which contains a valid and

10  enforceable arbitration provision.  Plaintiffs challenge Defendants' motion to compel arbitration

11  with the following arguments:  (1) California law, rather than Federal law, governs the arbitration

12  provision; (2) Plaintiffs never entered into an agreement to arbitrate; (3) a later-signed agreement

13  superseded the AMA's arbitration provision; and (4) the arbitration provision is unconscionable.

14  Neither party disputes this Court should determine the question of arbitrability.

15  A.    Federal Law Versus California Law

16          Plaintiffs contend California law governs this dispute to arbitrate because the activities

17  identified in the FAC do not have a substantial relation to interstate commerce.  Defendants argue

18  that the AMA governs activities that affect interstate commerce.

19          "The FAA applies to any contract affecting interstate commerce, including employment

20  agreements." *Yahoo! Inc. v. Iversen*, 836 F. Supp. 2d 1007, 1009 (N.D. Cal. 2011).  As this Court

21  recently explained in *Capriole v. Uber Technologies, Inc.*, No. 20-CV-02211-EMC, 2020 WL

22  2563276, at *7 (N.D. Cal. May 14, 2020), the Supreme Court has interpreted the phrase

23  "involving commerce" (the phrase used in § 2, the coverage provision, of the FAA) as indicating

24  "congressional intent to regulate to the full extent of its commerce power." *Circuit City Stores,*

25  *Inc. v. Adams*, 532 U.S. 105, 114 (2001) (citing *Allied-Bruce Terminix Companies, Inc. v. Dobson*,

26  513 U.S. 265, 277 (1995) ("Thus, the Court interpreted the words 'involving commerce' as

27  broadly as the words 'affecting commerce'; and, as we have said, these latter words normally

28  mean a full exercise of constitutional power.")).

United States District Court
Northern District of California

1    The Supreme Court has indicated that conduct may be said to "involve commerce" within

2    Congress' power to regulate where a company does business throughout an entire region of the

3    country or where large-scale "financial activities" can be said to have a "broad impact." *Citizens*

4    *Bank v. Alafabco, Inc.*, 539 U.S. 52, 58 (2003) (citing *Lewis v. BT Investment Managers, Inc.*, 447

5    U.S. 27, 38–39 (1980) ("[B]anking and related financial activities are of profound local concern

6    . . . . Nonetheless, it does not follow that these same activities lack important interstate

7    attributes"); *Perez v. United States*, 402 U.S. 146, 154 (1971) ("Extortionate credit transactions,

8    though purely intrastate, may in the judgment of Congress affect interstate commerce")) ("No

9    elaborate explanation is needed to make evident the broad impact of commercial lending on the

10   national economy or Congress' power to regulate that activity pursuant to the Commerce

11   Clause.").  Interstate commerce is also implicated where the materials or inputs needed to make a

12   final product come from outside the state, or where the products themselves cross state lines.

13   *Allied-Bruce*, 513 U.S. at 277, 282.

14   Here, Defendants have presented evidence (in the form of two declarations from Andrew

15   Schaad, the Director of Operations for WFG) that the company "is a marketing company

16   headquartered in Johns Creek, Georgia" that is "engaged in the recommendation, offer, or sale of

17   insurance and financial services and products" on a nationwide basis.  Declaration of Andrew

18   Schaad ("Schaad Decl.") ¶¶ 3, 4, Docket No. 73-4.  It "offers a business-marketing platform to

19   individuals throughout the United States who seek to run their own independent financial services

20   and/or insurance businesses." *Id.* ¶ 3.  Defendants also assert that WFG-affiliated Associates

21   "operate independent businesses and some offer the sale of insurance products from companies

22   such as Nationwide, headquartered in Ohio; Prudential, headquartered in New Jersey; and Everest

23   Funeral Concierge, headquartered in Houston, Texas.  Some of the independent business owners

24   also have helped others contract with Defendants, again, throughout the United States.  Some also

25   market their independent businesses online through Facebook, LinkedIn, and other similar

26   platforms."  Supplemental Declaration of Andrew Schaad ("Supp. Schaad Decl.") ¶ 3, Docket No.

27   75-3.

28   Given there is no dispute that Associates are located throughout the United States, sell

8

United States District Court
Northern District of California

1  products from companies in different states to customers in various states, market their products to

2  customers nationwide through online platforms, and recruit people (in states across the country) to

3  join WFG, this Court concludes that there is sufficient evidence that the relevant transactions

4  "involve commerce," and therefore that the FAA applies, rather than California law.

5  B.    Contract Formation

6         Plaintiffs argue that Defendants cannot demonstrate that a valid agreement to arbitrate

7  exists. Defendants contend they have met their burden because Plaintiffs' FAC admits that they

8  signed the AMA and had numerous opportunities to view the agreement.

9         With respect to formation, Defendants bear "the burden of proving the existence of an

10  agreement to arbitrate by a preponderance of the evidence." *Norcia*, 845 F.3d at 1283 (quoting

11  *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014)). Once it is established that a

12  valid agreement to arbitrate exists, the burden shifts to the party seeking to avoid arbitration to

13  show that the agreement should not be enforced. *Green Tree Fin. Corp.-Alabama v. Randolph*,

14  531 U.S. 79, 92 (2000). In adjudicating those issues, "the FAA limits courts' involvement to

15  'determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the

16  agreement encompasses the dispute at issue." *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114,

17  1119 (9th Cir. 2008) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130

18  (9th Cir. 2000)). Federal courts look to state law contract principles to determine the validity of an

19  arbitration agreement. *Circuit City*, 279 F.3d at 892. "Generally, under California law, the

20  essential elements for a contract are (1) 'parties capable of contracting'; (2) 'their consent;' (3) 'a

21  lawful object;' and (4) 'sufficient cause or consideration.'" *Norcia v. Samsung*

22  *Telecommunications Am., LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017) (quoting *United States ex rel.*

23  *Oliver v. Parsons Co.*, 195 F.3d 457, 462 (9th Cir. 1999)) (internal brackets omitted).

24         Here the dispute is whether Plaintiffs consented to the AMA and its arbitration provision.

25  Plaintiffs contend that they did not—and could not—consent because they received only the

26  signature page of the AMA when they were being recruited to join WFG and never actually saw or

27  received the entire AMA or the provision containing the arbitration agreement; they contend they

28  did not know they were signing or agreeing to the AMA contract. Plaintiffs' Opposition ("Opp.")

1    at 3–4, Docket No. 74.  For example, Ms. Yeomans states that she was told that the page she was

2    signing was a photo-release form that would permit WFG to use her photograph in promotional

3    materials.  *Id*. (citing Declaration of Tricia Yeomans ("Yeomans Decl.") ¶ 7, Docket No. 74-9).

4    On the one hand, Plaintiffs admit that they signed the AMA.  *See* FAC ¶ 5 ("As a condition

5    precedent to employment, all Associates are required to sign identical, non-negotiable Associate

6    Membership Agreements ("AMAs") . . . . Plaintiffs and Class Members signed the AMAs."); *see*

7    *also id.* ¶ 42 ("Defendants' relationship with all Associates is governed by the AMA, which is a

8    uniform, non-negotiable contract.  Defendants' uniform rules, policies, and procedures are

9    disseminated to all Associates via the company's intranet, and are incorporated by reference into

10   the AMA.").  However, on the other hand, Plaintiffs assert that "Defendants never provided

11   Plaintiffs with more than the signature page to the AMA and withheld the pages of the AMA that

12   included the arbitration agreement."  Opp. at 1; *see also* Declaration of Named Plaintiffs at Docket

13   Nos. 74-2 to 74-9 (stating, *e.g.*, "None of the pages I was given or reviewed contained a clause

14   indicating I had to arbitrate disputes with regards to my relationship with Defendants.  The only

15   page of the AMA I was given was the signature page.").  They claim they did not know they were

16   signing the AMA contract.

17          Although Defendants contend that Plaintiffs' declarations "prove they saw the full AMA,"

18   there is evidence in one of the exhibits to Mr. Schaad's declaration indicating that Ms. Yeomans

19   was only provided with the signature page of the AMA when she applied to join WFG.  In Mr.

20   Schaad's declaration, he indicates that Exhibit 9 to his declaration is a "true and correct copy" of

21   Ms. Yeomans's application to join WFG.  *See* Schaad Decl. ¶ 15.  That application contains only

22   seven pages (while the AMA is seventeen pages), and two of those seven pages are a tax form and

23   a credit card authorization form.  *See* Docket No. 73-13.  None of the pages contain information

24   about the arbitration agreement or clearly refer the signatory to a full copy of the AMA or where a

25   copy of that document might be found.  *Id.*  Indeed, it is not evident from the file that what was

26   being signed was a full contract.  Only the signature page of the AMA was included.

27          Defendants contend Plaintiffs received actual notice of the full AMA containing the

28   arbitration provision numerous times.  Specifically, Defendants allege that the following provided

1 | notice:

2 | • "The footer on the signature page describes the document as the 'Associate

3 | Membership Agreement' and states 'Page 6' as the page number, indicating five

4 | other pages." *Id.*

5 | • "The first paragraph on the signature page is 'Paragraph O,' indicating Paragraphs

6 | A through N before.  The last sentence of Paragraph O states, 'The Associate is

7 | over eighteen years of age and has read the above authorization and release prior to

8 | its execution,' indicating there is a prior authorization and release." *Id.*

9 | • "Likewise, the other documents Plaintiffs received and signed reference the AMA.

10 | For example, the Credit Card Agreement states it is for 'payment for the [AMA].'

11 | It also states, 'If you chose to pay by credit card, please complete the form below

12 | and attach it to the front of the [AMA].'  The acknowledgments state that agents

13 | 'must sign the World Financial Group [AMA].'" *Id.*

14 | The key is whether the party had notice of the contract.  In *Nguyen v. Barnes & Noble Inc.*, 763

15 | F.3d 1171 (9th Cir. 2014), the Ninth Circuit explained (in the context of examining online

16 | "browsewrap" agreements) that "courts have consistently enforced . . . agreements where the user

17 | had actual notice of the agreement."  763 F.3d at 1176.  But where "there is no evidence that the

18 | website user had actual knowledge of the agreement, the validity of the browsewrap agreement

19 | turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the

20 | contract." *Id.* at 1177.  It further noted that "[w]here the link to a website's terms of use is buried

21 | at the bottom of the page or tucked away in obscure corners of the website where users are

22 | unlikely to see it, courts have refused to enforce the browsewrap agreement." *Id.*; *see also*

23 | *Knutson*, 771 F.3d at 567 ("As a general rule, a party cannot avoid the terms of a contract by

24 | failing to read them before signing.  Yet an exception to this general rule exists when the writing

25 | does not appear to be a contract and the terms are not called to the attention of the recipient."

26 | (internal citations omitted)).  By contrast, "an offeree, regardless of apparent manifestation of his

27 | consent, is not bound by inconspicuous contractual provisions of which he was unaware,

28 | contained in a document whose contractual nature is not obvious." *Windsor Mills*, 25 Cal. App.

11

3d at 993.  "If a party wishes to bind in writing another to an agreement to arbitrate future disputes, such purpose shall be accomplished in a way that each party to the arrangement will fully and clearly comprehend that the agreement to arbitrate exists and binds the parties hereto." *Commercial Factors Corp. v. Kurtzman Bros.*, 131 Cal. App. 2d 133, 136 (1955); *see also Knutson*, 771 F.3d at 566 (same).

There are several reasons to think the forgoing factors offered by Defendants would be insufficient to put a reasonably prudent person on inquiry notice of the terms of the AMA, including its arbitration provision.  With respect to the fact that the AMA signature page contained a footer that said "Associate Membership Agreement" and "Page 6":  (1) the font of the footer is small and inconspicuous, (2) because it appears in the context of a multi-page application packet, the phrase "Associate Membership Agreement" could easily be read as applying to the application packet (7 pages) and not to a separate agreement (with 17 pages), and (3) the signature page appeared as Page 6 of Ms. Yeomans's application packet, and therefore would not necessarily have put her on notice that the signature page was Page 6 of *a separate agreement*, as opposed to the 7-page packet.  Thus, the Court is not convinced that the fact that the AMA signature page contained a footer that read "Associate Membership Agreement" and "Page 6" would put a reasonable person on notice that what he/she/they was signing was a full contract.

With respect to Defendants' argument that "[t]he first paragraph on the signature page is 'Paragraph O,' indicating Paragraphs A through N before," (thus creating notice there was a full 17-page AMA) that inference is not so clear.  The paragraph begins with "**O.**"  *See* Docket No. 73-5. The "O." almost looks like a bullet point.  Additionally, while the last sentence of the signature page refers to "the above authorization and release," Paragraph O is a photo release, and nothing in that final sentence suggests that "the above authorization and release" would refer to something broader than that single paragraph that authorized Defendants' use of photographs of the applicant.

As to other documents in the application packet which referred to the AMA, again, the evidence suggests that a reasonable person could easily have interpreted the referral as being directed to the application packet itself as being the AMA.  For instance, the Credit Card Agreement states it is for "payment for the [AMA]" and asks applicants to attach the credit card

form to the front of the AMA; however, the application packet for Tricia Yeomans (provided by Defendants) indicates that the credit card form was completed on the same day as the rest of the application packet.  Thus, if anything, the fact that the credit card form asks applicants to attach that document to the AMA, coupled with the fact that the document they were returning to Defendants was the application packet, suggests that a reasonable applicant could easily conclude that the application packet, not the full 17 page AMA they did not notice, *was* the "AMA" being referred to.  Accordingly, the Court is not persuaded that the existence of other documents completed alongside the application packet would put a reasonable person on notice of the terms to which they were purportedly being bound to a full agreement—the 17 page AMA.

The cases cited by Defendants (whether or not the plaintiffs in the case were held to an arbitration agreement) involved situations in which the full text of the arbitration agreement was readily available to the plaintiffs.  *See, e.g.*, *Nguyen*, 763 F.3d at 1177 ("'Terms of Use' hyperlink in the bottom left-hand corner of every page"); *Knutson*, 771 F.3d at 562 (Customer Agreement mailed to plaintiff); *Knepper*, 2019 WL 144585, at *5 (arbitration agreement sent to plaintiff by email, which she opened, and multiple reminders sent as well).  Here, there is no evidence before the Court that Plaintiffs had ready access to the complete AMA at the time they signed the signature page in the application packet (with the exception of, perhaps, Ms. Abtahi).  As Plaintiffs represent, they were only "presented with a small packet of paper documents" and "were not shown or provided with the rest of the AMA when they signed the photographic release signature page, and therefore had no idea they were purportedly waiving all rights to litigate their disputes with Defendants in a court of law."  Opp. at 12 (citing Plaintiffs' Decls. at ¶ 2).

Defendants contend that Plaintiffs have always "had the ability to review the full AMA on WFG's online website."  Reply at 9 (citing Schaad Decl. ¶¶ 6, 7; Declaration of Chad Palid ("Palid Decl") ¶ 8, Docket No. 75-2.  However, the evidence presented in support of that contention is not persuasive.  In the declaration of Chip Palid (a WFG Associate with no apparent relationship to this case), he attests:  "Since approximately 2016, individuals have completed the AMA (currently called the Agent Agreement) online and signed it via DocuSign.  After doing so, they have the ability to access and view it."  Palid Decl. ¶ 8.  But Mr. Palid does not explain the

United States District Court
Northern District of California

basis of his personal knowledge with respect to the named Plaintiffs, individually, or account for the fact that only Ms. Abtahi (who denies using DocuSign, as discussed below) signed the forms in 2016 or later.  In Mr. Schaad's declaration, he states:  "At all relevant times, individuals who wanted to contract with Defendants had access to the full AMA through a variety of means.  They could access the AMA through a public website using an access code provided by an agent or they could request a hard copy from an agent or Defendants."  Schaad Decl. ¶ 7.  However, even assuming this is true, as discussed above, there was no obvious reason for an applicant to seek out a copy of the AMA because the 7-page application packet would not have put a reasonable person on notice of any additional terms to which they were being bound.

For Plaintiff Fatemeh Abtahi specifically, Defendants argue that, despite her representations to the contrary, she saw the full AMA when she signed her name to the document via DocuSign.[3]  Mr. Schaad asserts that "[t]o sign via DocuSign, agents must access on online portal.  Before December 2018, that portal contained a copy of the full AMA.  It now contains a full copy of the Agent Agreement (formerly the AMA)."  Schaad Decl. ¶ 6.  Defendants have submitted a document purported to be the full copy of an AMA initialed and signed (in various places across three different pages) by Ms. Abtahi via DocuSign.  *See* Schaad Decl. ¶ 6; *see also* Docket No. 73-6 (document alleged to be a full AMA initialed and signed by Ms. Abtahi).

But Plaintiffs contend that "Ms. Abtahi never DocuSigned the AMA," and that "the AMA was DocuSigned without her consent by someone else."  Opp. at 4 (citing Declaration of Fatemeh Abtahi  ("Abtahi Decl.") ¶ 8, Docket No. 74-6).  They also note two irregularities in the document presented by WFG:  "the purported signature on the AMA actually reverses Ms. Abtahi's first and last names, and the initialed portions of the document again reverse her first and last name initials, which is not a mistake that Ms. Abtahi would have made while signing her own name."  *Id.* (citing Abtahi Decl. ¶ 11).  Finally, Plaintiffs suggest that Chad Greer (one of Ms. Abtahi's trainers) may have been the one to sign her name via DocuSign.  *Id.* (Abtahi Decl. ¶ 11).

---

[3] Defendants note that Ms. Abtahi was "the only plaintiff to DocuSign the AMA."  Reply to Plaintiffs' Opposition ("Reply") at 5, Docket No. 75.  Although she denies doing so, this representation by Defendants implies that no other named Plaintiff signed their AMA via DocuSign.

United States District Court
Northern District of California

Defendants offer numerous responses to these allegations of forgery, *e.g.*, purported evidence of Ms. Abtahi's "DocuSign Certificate" and alleged cultural differences with respect to signing one's family name first, as argued by defense counsel at the hearing.  This Court need not go through each of Defendants' proffered theories.  Plaintiffs, themselves, admit to fraudulently signing AMAs on behalf of recruitees via DocuSign.  *See* Declarations of Plaintiffs Abtahi, Braford, Chraibi, and Yeomans ¶ 2 (stating, *e.g.*, "When I docusigned on behalf of the new recruit, I never reviewed the document with or provided a copy to the new recruit.  To be clear, I would sign the downline associate's name and/or initials to documents, including the signature page of the AMA.").  Thus, taking these allegations as true, it would not be abnormal for Ms. Abtahi's recruiter signed on her behalf.

What is of particular import for purposes of formation is whether Ms. Abtahi and the other named Plaintiffs subsequently saw the full AMA and had an opportunity to review it after they signed.  If they did, and they continued their work for Defendants, they could then be charged with the obligations of the agreement.  Under California law, "a party's acceptance of an agreement to arbitrate may be . . . implied-in-fact where . . . the employee's continued employment constitutes her acceptance of an agreement proposed by her employer."  *Craig v. Brown & Root, Inc.*, 84 Cal. App. 4th 416, 420 (2000).  A party may be bound by an arbitration agreement even where that party is not aware of all the terms in the contract.  *See, e.g.*, *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 992 (Ct. App. 1972) ("[A]n offeree, knowing that an offer has been made to him but not knowing all of its terms, may be held to have accepted, by his conduct, whatever terms the offer contains."); *see Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 567 (9th Cir. 2014) ("As a general rule, a party cannot avoid the terms of a contract by failing to read them before signing.").

Here, Defendants contend that—because DocuSign required someone to scroll past all pages of the AMA before getting to the signature page—Plaintiffs became aware of the full terms of the AMA when they signed the signature page for new recruits and "kept performing under [the AMA]" such that they can be understood to have consented to the arbitration agreement contained in the AMA (at least as of the time when they signed on behalf of new recruits).  Reply at 5.

United States District Court
Northern District of California

1    Plaintiffs allege, however, that DocuSign simply brings the user to the pages that require a

2    signature, thereby forgoing all the relevant text of the AMA because only the last page has a

3    signature block.  But at the hearing, neither party offered a demonstration of the precise contours

4    of DocuSign.  Such a demonstration is not necessary to resolve this formation issue.

5            As noted above, the question is whether Plaintiffs had notice of the AMA as a contract.

6    Here, Plaintiffs Abtahi, Braford, Chraibi, and Yeomans attest to using DocuSign to complete

7    AMAs on behalf of new recruits.  That process would permit the user clear opportunity to view all

8    pages of the AMA in DocuSign, and even if the terms are not carefully read, gives notice that

9    there was a comprehensive agreement called an AMA.  These four plaintiffs thus had notice of the

10   existence of the full AMA, and by their continued work on behalf of Defendants manifested

11   acceptance of that agreement, including the agreement to arbitration.  *See Craig*, 84 Cal. App. 4th

12   at 420; *see, e.g.*, Docket Nos. 74-4, 74-6, 74-7, 74-9, Bradford Decl., ¶ 11; Abtahi Decl., ¶ 16;

13   Chraibi Decl., ¶ 16; Yeomans Decl., ¶ 17.  Similarly, Mrs. Jenkins later had an opportunity to

14   view the AMA when she recruited her husband, Mr. Jenkins.  Moreover, Mr. Jenkins's declaration

15   admits to seeing the full AMA.[4]  Thus, the Court finds that Defendants have met their burden in

16   demonstrating that Plaintiffs—except for Mr. Rodriguez—agreed to the terms of the AMA when

17   they had an opportunity to review the full terms, yet continued their work with Defendants.  *See*

18   *Craig*, 84 Cal. App. 4th at 420.

19           However, there are no allegations that Mr. Rodriguez ever saw the full AMA either

20   directly or as part of recruiting efforts or signed DocuSign on behalf of individuals he recruited.

21   Therefore, the Court concludes Defendants have failed to demonstrate, by a preponderance of the

22   evidence, that Mr. Rodriguez had notice of the AMA and therefore did not agree to the arbitration

23

24   ---

[4] *See* Docket No. 74-8 ¶ 9 ("[O]n one occasion I believe I came across a copy of the full AMA
25   when an agent I recruited brought it to my attention that he received an email with an agreement
     that was different than the one he signed.  I was new to the company so I did not review the
26   document and, instead, brought it to the attention of my recruiter and trainers Chad Greer,
     Stephanie Haynes, and Alex Haynes.  They informed me that what he received was irrelevant and
27   not to concern myself with it.  They told me there was no need to follow up and essentially swept
     the whole incident under the rug.  Chad, Stephanie, and Alex confirmed that the only agreement
28   that I should be focused on and presenting to new recruits was the aforementioned small five to
     seven page packet that I was presented with.").

16

United States District Court
Northern District of California

1  provision contained the AMA.

2  C.     Revocability Based on Subsequent Agreement

3       Plaintiffs contend that the Marketing Director Agreement ("MDA") (the agreement that

4  must be signed upon promotion to the position of Marketing Director) signed by all Plaintiffs

5  except Robert Jenkins (who was not promoted to that position), supersedes the AMA and

6  contemplates a judicial, rather than an arbitral, forum.  Opp. at 15.  That agreement states in

7  relevant part ("Governing Law"):

8           You and WFG agree that this Agreement will be governed by the
            laws of the State of Georgia. If Georgia conflict or choice of law
9           rules would choose a law of another state, each party waives such
            rules and agrees that the substantive law of the State of Georgia
10          shall nonetheless govern. The parties agree that the state and federal
            courts of Georgia shall have exclusive jurisdiction of any litigation
11          between the parties and the Marketing Director expressly submits to
            the jurisdiction and venue of the federal and state courts sitting in
12          Fulton County, Georgia, with respect to such litigation.

13  Docket No. 24-3.  However, the MDA also includes the following statement:  "Unless the

14  provisions of this Agreement expressly provide otherwise, *the terms and conditions* of your

15  *Associate Membership Agreement remain in force*."  *Id.* (emphasis added).

16       It is not clear that this provision of the MDA unsettles the parties' earlier agreement to

17  arbitrate.  The AMA contemplated the possibility that Defendants would seek equitable or

18  extraordinary relief through the courts in certain circumstances.  *See* AMA, art. VI ("The

19  Associate agrees that . . . WFG may seek Extraordinary Relief in the federal and state courts of the

20  State of Georgia, in any court of competent jurisdiction outside the State of Georgia, as well as in

21  Good Faith Arbitration and if justice requires, in more than one of them . . . . ").  Thus, the MDA's

22  reference to Georgia as a venue for litigation in court is not inconsistent with the AMA.

23       Defendants rely on *Ramirez-Baker v. Beazer Homes, Inc.*, 636 F. Supp. 2d 1008 (E.D. Cal.

24  2008) for the proposition that a "later employment contract d[oes] not supersede the original

25  arbitration agreement [where] the later contracts were silent on arbitration."  *Ramirez-Baker*, 636

26  F. Supp. 2d at 1016.  Because the MDA is silent on arbitration, this Court concludes that it is not

27  an "explicit intention" to rescind the AMA's arbitration clause.  *See Homestake Lead Co. of*

28  *Missouri v. Doe Run Res. Corp.*, 282 F. Supp. 2d 1131, 1142 (N.D. Cal. 2003) (citing *WorldCrisa*

1  *Corp. v. Armstrong*, 129 F.3d 71, 75 (2d Cir. 1997) ("Absent the explicit intention to rescind an

2  arbitration clause, however, the clause will survive even where the prior agreement itself is

3  rescinded by the latter agreement."). Accordingly, this Court finds that the MDA did not

4  supersede the AMA's arbitration provision.

5  D.    Unconscionability

6         Plaintiffs challenge the AMA's arbitration provision on grounds of unconscionability.

7  Defendants concede that there exists both procedural and substantive unconscionability, but they

8  argue that there is only minimal with respect to both. "[P]rocedural and substantive

9  unconscionability must *both* be present in order for a court to exercise its discretion to refuse to

10 enforce a contract or clause under the doctrine of unconscionability." *Armendariz v. Found.*

11 *Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114, 6 P.3d 669 (2000) (emphasis in original). In

12 addition, the Ninth Circuit has concluded that "California law regarding unconscionable contracts"

13 is not inherently "unfavorable towards arbitration," and instead "reflects a generally applicable

14 policy against abuses of bargaining power." *Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 927

15 (9th Cir. 2013).

16        1.    Procedural Unconscionability

17        "Procedural unconscionability exists when the stronger party drafts the contract and

18 presents it to the weaker party on a 'take-it-or-leave-it basis.'" *Serafin v. Balco Properties Ltd.,*

19 *LLC*, 235 Cal. App. 4th 165, 179 (2015). This can render an agreement a contract of adhesion. *Id.*

20 "However, the fact that the arbitration agreement is an adhesion contract does not render it

21 automatically unenforceable as unconscionable. Courts have consistently held that the requirement

22 to enter into an arbitration agreement is not a bar to its enforcement." *Id.* Instead, "[t]he

23 procedural element focuses on two factors: 'oppression' and 'surprise.' 'Oppression' arises from

24 an inequality of bargaining power which results in no real negotiation and 'an absence of

25 meaningful choice.' 'Surprise' involves the extent to which the supposedly agreed-upon terms of

26 the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the

27 disputed terms.'" *Zullo v. Superior Court*, 197 Cal. App. 4th 477, 484 (2011) (internal citations

28 omitted). "Substantive unconscionability refers to overly harsh or unjustifiable one-sided results."

United States District Court
Northern District of California

1   *Id.*

2        Here with respect to oppression, Plaintiffs contend (and Defendants do not meaningfully

3   dispute) that the AMA was a contract of adhesion because Defendants "drafted the agreement and

4   presented the packet containing the AMA's signature page to Plaintiffs on a 'take it or leave it'

5   basis." Opp. at 18.  At the moment in which the application packets were presented, applicants

6   "had a stark choice: either sign the AMA signature page as part of the sign-up packet, or reject the

7   agreement and not take the job." *Id.*  "[T]here was no meaningful opportunity to negotiate the

8   terms of the agreement." *Id.*  Nor was there an option to opt out.

9        With respect to surprise, as noted above, Plaintiffs assert that they were never presented

10  with the full AMA, the arbitration provision it contained, or any hint that they were binding

11  themselves to additional terms when the signed the signature page contained in the WFG

12  application packet, at least until sometime later they had notice of the AMA when they recruited

13  others.  *See, e.g.*, *Carlson v. Home Team Pest Def., Inc.*, 239 Cal. App. 4th 619, 633 (2015)

14  (finding procedural unconscionability where plaintiff "was required to sign the Agreement without

15  time for reflection" and noting that "failure to disclose the terms of arbitration and the applicable

16  rules also constitute surprise").

17       The AMA's rollout was plagued with an element of surprise due to all the reasons

18  discussed above regarding formation.  As previously noted, Defendants' own declaration indicates

19  that Ms. Yeomans only received a 7-page packet containing just the signature page of the AMA

20  when she became an Associate for Defendants.  She only became aware (at least constructively) of

21  the existence of the AMA when she subsequently recruited other individuals to become

22  Associate—only because she signed the AMA on their behalf; those individuals presumably did

23  not know about the arbitration provision until it was their turn to recruit.  Moreover, although the

24  heading of the AMA's arbitration provision is underscored in bold (like all other headings), the

25  text is in single-spaced, small-type font.  To be exact, the AMA is written in 9-point font.  The

26  California Supreme Court recently affirmed a trial court's finding of surprise in a procedural

27  unconscionability determination when the arbitration agreement was made up of 8.5-point font

28  because the text was "visually impenetrable" and "challenge[s] the limits of legibility.  *OTO,*

1    *L.L.C. v. Kho*, 8 Cal. 5th 111, 128 (2019), *cert. denied sub nom. OTO, L.L.C. v. Ken Kho,* 207 L.

2    Ed. 2d 170 (June 8, 2020) (alterations in original).  Indeed, the court concluded, as does this Court

3    regarding the AMA, that "[a] layperson trying to navigate this block text, printed in tiny font,

4    would not have an easy journey." *Id.*

5         The prolix is further exacerbated by the arbitration provisions use of undefined terms,

6    definitions of which are located elsewhere.  The first sentence of the AMA's arbitration provision

7    reads "[t]he Parties agree that, except as specifically provided to the contrary in this Agreement,

8    any Grievance shall be resolved exclusively by Good Faith Arbitration."  AMA, art. V.  The AMA

9    does not define what the term "Grievance" or the phrase "Good Faith Arbitration" means.  The

10   reader must turn to Paragraph I of the Glossary and Explanation of Terms—a wholly separate

11   document that is similarly single spaced and in small-scale font—to find the *general* definition of

12   "Good Faith Arbitration," followed by seven separate terms and definition that make up good faith

13   arbitration.[5]  Then, the reader must scroll further to uncover the definition of "Grievance"[6] in order

14   to put it all together  Although these agreed-upon terms were not hidden *per se*, they were not

15   contained within the AMA's arbitration provision, and a reader seeking to make sense of the

16   arbitration provision would have to flip through a separate document in order to understand the

17

18   [5] "All Grievances shall be resolved by Good Faith Arbitration in accordance with the Rules,
     except that, or in addition to such Rules:  i) in order to assure neutrality and impartiality of the

19   arbitrator(s), and to preserve the confidentiality of proprietary information, the arbitrator(s) shall
     not be any present or past owner, officer, director, employee, consultant, associate, agent,

20   registered representative, attorney or other representative of any insurance company, insurance
     broker or insurance agency, securities broker, securities dealer or mortgage company, investment

21   advisor, or of any affiliate of any of them; ii) the Parties may be entitled to such discovery and
     protective orders as provided herein; iii) the locale where the arbitration shall be held is the

22   principal head office of WFG in Duluth, Georgia or, if that location is not convenient for all
     Parties, they shall try to devise a way so that it is convenient, or if that location cannot be made

23   convenient, at such other place as the Parties may agree, or, if they cannot agree, then as may be
     set by the Rules, as the case may be: iv) a transcript shall be made on the proceeding; and v) the

24   arbitrator's(s') award shall state their findings of fact and conclusions of law."  Glossary and
     Explanation of Terms at ¶ I(1) (general definition); *see also id* at ¶ I(2)–(8) (definitions of judicial

25   review of award, discovery, protective orders, waiver of litigation, no condition precedent to
     action and power of arbitrators, extraordinary relief, statute of limitations, and beneficiaries).

26

27   [6] Any controversy, claim, or dispute arising out of or relating to this Agreement, between the
     Associate, on the one part, and WFG and/or any of the Corporate People, or any of them, on the

28   other part."  *Id.* ¶ J.  "Corporate People" is defined earlier in the Glossary as "Any and all of the
     officers, directors, and employees of WFG, whether present or past and whether in their individual
     or their corporate capacities."  *Id.* ¶ C.

1  extent to which they would be bound.

2        Although the Glossary makes reference to the "Rules" of arbitration, Defendants did not

3  provide a copy of the rules that would govern their arbitration proceedings.  Indeed, "Rules" is not

4  defined until near the end of the Glossary and even then makes reference to the AAA rules without

5  a hyperlink or an instruction as to how to obtain them.  At the hearing herein, Defendants' counsel

6  could not even explain what the substance of the AAA's rule on venue provided.  As this Court

7  has noted:

8              It is true that some courts have found procedural unconscionability
             based on the failure to provide AAA rules or the failure to identify
9             which of the then existing AAA rules govern. *See Carbajal v.
             CWPSC, Inc.*, 245 Cal. App. 4th 227, 244 (Cal. Ct. App. 2016).
10            However, this Court is bound by California Supreme Court
             precedent which holds that where a "challenge to the enforcement of
11            the agreement has nothing to do with the AAA rules" and the only
             challenges to the contract concern "matters that were clearly
12            delineated in the agreement she signed" a party's "failure to attach
             the AAA rules" alone does not raise the level of procedural
13            unconscionability. *Baltazar*, 62 Cal. 4th at 1246. Courts have,
             however, recognized that when AAA rules are incorporated by
14            reference, courts may "more closely scrutinize the substantive
             unconscionability of terms appearing only in the [AAA] rules", but
15            incorporation alone does not amount to oppression. *Poublon v. C.H.
             Robinson Co.*, 846 F.3d 1251, 1262 (9th Cir. 2017) (quoting
16            *Baltazar*, 62 Cal. 4th at 1246).

17  *Pereyra v. Guaranteed Rate, Inc.*, No. 18-CV-06669-EMC, 2019 WL 2716519, at *4 (N.D. Cal.

18  June 28, 2019).

19        The Court concludes that there was a significantly high degree of procedural

20  unconscionability associated with Plaintiffs' (except for Mr. Rodriguez) assent to arbitration.

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

United States District Court
Northern District of California

2.     <u>Substantive Unconscionability</u>

As to substantive unconscionability, Plaintiffs' note that the AMA's contains two

provisions (the "Extraordinary Relief"[7] clause and the "Equitable Relief"[8] clause), which "are

designed to allow Defendants—and Defendants only—the option of circumventing the arbitration

process for the claims they felt were important enough to them to go the extreme position of

excluding themselves from arbitration for those claims, while requiring all employees to submit

those very claims to the arbitration process."  In California, "[c]ourts have found one-sided

employer-imposed arbitration provisions unconscionable where they provide that employee claims

will be arbitrated, but the employer retains the right to file a lawsuit in court for claims it initiates,

or where only the types of claims likely to be brought by employees (wrongful termination,

discrimination etc.) are made subject to arbitration."  *Serafin*, 235 Cal. App. 4th at 181.  Here, the

one-sidedness of arbitration is even more stark.  This is not a case where, *e.g.*, either party can

seek an injunction to force compliance with a confidentiality clause—where there is facial

mutuality but results in a de facto advantage to the employer.  Here, the one-sidedness is *facial*.

This one-sided provision is substantively unconscionable.

Second, Plaintiffs contend that the attorneys' fees provision of the AMA is also

---

[7] "<u>Extraordinary Relief</u>.  The Parties agree that WFG has the right to seek preliminary and temporary restraining orders, injunctions and other extraordinary relief (such orders, injunctions and other relief referred to as "Extraordinary Relief") under Article VI of this Agreement without complying with Article V of the Agreement or this Section I.  Without limitation, the Parties agree that the requirements for Good Faith Arbitration under Article V of the Agreement or this Section do not preclude WFG from seeking in an arbitral or in a judicial forum, or in both, Extraordinary Relief to protect its rights under Article VI of the Agreement.  Neither Article V of the Agreement or this Section I shall be deemed to preclude or narrow the judicial or arbitral powers regarding Extraordinary Relief."  AMA, art. VI.

[8] "<u>Equitable Relief</u>.  The Associate acknowledges and agrees that, in the event that he/she were to violate or threaten to violate any of the Covenants, WFG's recovery of damages would be inadequate to protect WFG. Accordingly, the Associate agrees that, in the event of a violation, actual or threatened, of any such Covenants, WFG shall be entitled to injunctive relief and specific performance, notwithstanding any other provision of this Agreement to the contrary.  The Associate acknowledges and agrees that injunctive relief and specific performance are appropriate and necessary in the event of a violation, actual or threatened, of such covenants because there may be no adequate remedy at law for violation of any of such Covenants in that, among other reasons, the property rights of WFG which are protected by such covenants are unique assets which cannot be readily replaced in any reasonable period of time or in any other way adequately protected."  Glossary, ¶ D, § 7.

United States District Court
Northern District of California

substantively unconscionable.  The provision provides:  "If any Party hereto commences an action or arbitration to enforce any of the provisions hereof, the prevailing Party in such action shall be entitled to an award of its reasonable attorneys' fees and all costs and expenses incurred in connection therewith."  AMA, art IX, ¶ J.  California courts have previously disapproved of mandatory fee and cost provisions where a plaintiff who failed to prevail on similar claims in court would be responsible for attorneys' fees only where the action was "frivolous, unreasonable, without foundation, or brought in bad faith."  *Trivedi v. Curexo Tech. Corp.*, 189 Cal. App. 4th 387, 394 (2010), *disapproved of on other grounds by Baltazar v. Forever 21, Inc.*, 62 Cal. 4th 1237, 367 P.3d 6 (2016) ("a mandatory attorney fee and cost provision in favor of the prevailing party was unconscionable because it placed [the plaintiff] at greater risk than if he retained the right to bring his . . . claims in court"); *see also Ajamian v. CantorCO2e, L.P.*, 203 Cal. App. 4th 771, 800 (2012) (finding the attorneys' fees provision unconscionable in part because "it imposes on [plaintiff] the obligation to pay [defendant]'s attorney fees where she would have no such obligation under at least one of her California statutory claims").  Here, Plaintiffs assert causes of action under California Labor Code § 218.5(a), which contemplates imposition of attorneys' fees on a losing plaintiff only where "the court finds that the employee brought the court action in bad faith," Cal. Lab. Code § 218.5(a), and California Labor Code § 1194, which entitles only a prevailing employee (and not the employer) to "reasonable attorney's fees," Cal. Lab. Code § 1194(a).  This provision undermines the balance of the risk of fee shifting prescribed by statute and can have a substantial chilling effect on plaintiffs seeking to vindicate their rights.  This provision is substantively unconscionable.

Plaintiffs also contend that the arbitration agreement is substantively unconscionable because "the AMA only provides for discovery at the arbitrator's discretion," Opp. at 22, while the law requires that the parties "will have the same rights, remedies, and procedures . . . as if the subject matter of the arbitration were pending before a superior court," *id.* (quoting Cal. Code Civ. P. § 1283.05(a)).  But this Court has previously explained:

> California courts that have actually analyzed the AAA rule[9] have each found that it satisfies *Armendariz*'s requirements of discovery, in which "the employer impliedly agreed to all discovery necessary to adequately arbitrate the claims." *Lane*, 224 Cal. 4th at 693. While the AAA rule does not require the arbitrator to allow discovery, it does require that the arbitrator allow discovery necessary to a full and fair exploration of the issues, and there is no indication here that Plaintiff risks a situation in which an arbitrator could completely deny discovery. Here, Defendant makes no such claim that all discovery should be denied, and the rule at issue grants the arbitrator the authority to order discovery as is necessary to fully and fairly explore the issues in dispute. Thus, the Court finds that there is no substantively unconscionable limitation on discovery.

*Colvin v. NASDAQ OMX Grp., Inc.*, No. 15-CV-02078-EMC, 2015 WL 6735292, at *7 (N.D. Cal. Nov. 4, 2015).

Accordingly, although the discovery issue does not appear to add to a finding of substantive unconscionability, the one-sidedness of the right to seek relief in court and the bar on attorneys' fees support a finding of substantive unconscionability.

Moreover, the Court finds an additional provision to be substantively unconscionable: the AMA's requirement to litigate all claims in the state of Georgia and to apply Georgia law. *See* AMA, art IX, ¶ L. The burden imposed on individual plaintiffs is obvious—Defendants are headquartered in Johns Creek, Georgia. *See* Schaad Decl. ¶¶ 3, 4. The Court finds the provision mandating all court litigation to occur in the state of Defendants' headquarters, as well as the application of Georgia law, to be unduly one-sided such that it would serve as a deterrent to litigants who otherwise do not have the means to litigate in a foreign state.

In toto, the Court concludes there are at least three substantive unconscionable provisions contained in the AMA's arbitration provision. "A sliding scale is applied so that the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Serafin*, 235 Cal. App. 4th at 178. The Court disagrees with Defendants' argument that there is only a minimal degree of both procedural and substantive unconscionability. As stated above, the Court finds there is a remarkably high degree of procedural unconscionability, which in turn only requires a

---

[9] The AAA rules are the same rules that will govern the arbitration agreement here.

1    finding of a low degree of substantive unconscionability in order to conclude the arbitration

2    provision is unenforceable.  With three problematic provisions, the AMA has far more than a low

3    degree of substantive unconscionability.  Thus, the Court concludes that the AMA's arbitration

4    provision is unenforceable unless severance is in the interest of justice.

5            3.    Severance

6        Because the Court finds—and Defendants concede—that both procedural and substantive

7    unconscionability are present, the Court must analyze whether the unconscionable parts of the

8    arbitration provision should be severed or whether it should refuse to enforce the arbitration

9    agreement altogether because unconscionability permeates the entire agreement.

10       "If the court as a matter of law finds the contract or any clause of the contract to have been

11   unconscionable at the time it was made the court may refuse to enforce the contract, or it may

12   enforce the remainder of the contract without the unconscionable clause, or it may so limit the

13   application of any unconscionable clause as to avoid any unconscionable result."  Cal. Civ. Code.

14   § 1670.5(a).  The Court has the discretion to sever or limit unconscionable clauses.  *See id*.; *see*

15   *also Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1272 (9th Cir. 2017).  The California Supreme

16   Court in *Armendariz* weighed three factors in determining whether severance is appropriate:  (1)

17   whether the substantively unconscionable provision relates to the arbitration agreement's chief

18   objective; (2) whether the arbitration agreement contained multiple substantively unconscionable

19   provisions such that it indicates a systematic effort to impose arbitration not simply as an

20   alternative to litigation, but as an inferior forum; and (3) a lack of mutuality that permeated the

21   entire agreement.  24 Cal. 4th at 124–25; *see also Poublon*, 846 F.3d at 1272 (severance is

22   determined by examining the unconscionable provisions in relation to the purpose of the contract).

23   "[A] contract is permeated with unlawfulness (and severance is inappropriate) where '[t]he good

24   cannot be separated from the bad, or rather the bad enters into and permeates the whole contract,

25   so that none of it can be said to be good.'"  *Poublon*, 846 F.3d at 1272 (quoting *Keene v. Harling*,

26   61 Cal. 2d 318, 322 (1964)) (second alteration in original).

27       The Court must determine whether the AMA's arbitration provision is so permeated with

28   unconscionability that severing the unconscionable clauses will make the contract sufficiently

United States District Court
Northern District of California

25

lawful and conscionable.  Here, severance of the problematic provisions, *e.g.*, prohibition on the

attorneys' fees, one-sided extraordinary/equitable relief, and the choice-of-law provision could be

mechanically accomplished without "reformation and augmentation of the agreement."  *Roman v.*

*Superior Court*, 172 Cal. App. 4th 1462, 1478 (2009).  Indeed, this Court has previously severed

identical provisions and compelled arbitration.  *See Pereyra v. Guaranteed Rate, Inc.*, No. 18-CV-

06669-EMC, 2019 WL 2716519, at \*10 (N.D. Cal. June 28, 2019) (serving choice of law

provision, the lack of mutuality pertaining to exceptions from arbitration, the fee provision, and

the choice of forum provision and compelling arbitration).

However, the Court finds that the AMA is permeated by both a substantial degree of

procedural unconscionability as well as multiple substantively unconscionable provisions that are

designed to confer an unfair unilateral advantage to Defendants, which serves to chill attempts by

would-be plaintiffs to vindicate their rights.  *See Perez v. DirecTV Grp. Holdings, LLC*, No.

816CV1440JLSDFMX, 2017 WL 8117452, at \*1 (C.D. Cal. Sept. 22, 2017) ("the high degree of

procedural unconscionability—*i.e.*, convincing a Spanish-speaking beauty salon owner to sign an

agreement that the sales representative knew she could not understand and withholding key terms

until a consumer would have to pay steep penalties to cancel—means that it is not possible to

remove the unconscionable taint to the arbitration agreement through severance.") (internal

quotations omitted); *see also Sherwood v. Blue Cross*, No. CIV. S-07-633 LKK/DA, 2007 WL

2705262, at \*5 (E.D. Cal. Sept. 14, 2007) ("While the court could attempt to sever the

substantively unconscionable provisions of the arbitration agreement in order to save the

remaining provisions, where defendants have openly admitted that the contract was procedurally

unconscionable, this result would not be in the interests of justice.  Here, the undisputed element

of procedural unconscionability permeates the entire agreement, rendering the entire agreement

unenforceable.") (internal citations omitted); *Cf. Mok v. Optum, United Healthcare Servs., Inc.*,

No. CV 13-04577 RS, 2014 WL 10754130, at \*6 (N.D. Cal. Feb. 10, 2014) ("In this case it is not

appropriate to invalidate the entire agreement.  The injunction provision can be severed and

clearly is not the purpose of the agreement.  Once the offending provision is severed, the

remaining degree of procedural unconscionability is too low to warrant invalidating the entire

United States District Court
Northern District of California

1    agreement.  Accordingly, Mok has failed to demonstrate that the agreement is so permeated with

2    unconscionability that it is rendered completely unenforceable.").

3           Here it is apparent that the AMA, and the process by which consent was obtained, is

4    tainted with an evident intent to deter individuals from enforcing their rights under California law.

5    *Poublon*, 846 F.3d at 1272 (quoting *Marathon Entm't, Inc. v. Blasi*, 42 Cal. 4th 974, 996, (2008)

6    ("If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot

7    be enforced.  If the illegality is collateral to the main purpose of the contract, and the illegal

8    provision can be extirpated from the contract by means of severance or restriction, then such

9    severance and restriction are appropriate.").  The provision lacks mutuality and contains

10   burdensome and chilling deterrents to associates seeking to enforce their legal rights.

11   Unconscionability permeates the agreement.

12                                  **V.        CONCLUSION**

13          For the foregoing reasons, the Court **DENIES** Defendants' Motion to Compel Arbitration,

14   Dismiss Class Claims, and Stay Case.  Mr. Rodriguez is not bound by the arbitration provision.

15   As to the other Plaintiffs, the arbitration provisions are unconscionable and unenforceable.

16   Although the AMA contains a severance provision, it is not entitled to deference under these

17   circumstances.

18          This order disposes of Docket No. 73.

19

20          **IT IS SO ORDERED**.

21

22   Dated: September 11, 2020

23

24   _____

25   EDWARD M. CHEN
     United States District Judge

26

27

28